C. Moze Cowper (Bar No. 326614)
**COWPER LAW PC**
12301 Wilshire Boulevard, Suite 303
Los Angeles, California 90025
Tel.: (877) 529-3707

Edward Fisher (*to be admitted pro hac*)
**PROVOST UMPHREY LAW FIRM**
350 Pine Street, Suite 1100
Beaumont, Texas 77701
Tel.: (409) 838-8813

Patrick Barrett (*to be admitted pro hac*)
**PROVOST UMPHREY LAW FIRM**
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
Tel.: (615) 297-1932

*Attorneys for Plaintiff (additional counsel listed on signature page)*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE (C.M.S.), an individual,<br><br>Plaintiff,<br><br>vs.<br><br>WYNDHAM HOTELS & RESORTS, INC.; WYNDHAM HOTEL GROUP, LLC; RAMADA WORLDWIDE INC.; SANT KABIR, LLC; GOLDEN BRIDGE INTERNATIONAL INVESTMENT INC.; SUPER 8 WORLDWIDE, INC.; ARS HOSPITALITY, LLC; SPORTS ARENA HOTEL VENTURE, L.P.; LA QUINTA FRANCHISING, LLC; LA QUINTA HOLDINGS, INC.; OHM KARESHVER, INC.; HILTON DOMESTIC OPERATING COMPANY INC.; APPLE EIGHT HOSPITALITY MANAGEMENT, INC.; CHOICE HOTEL INTERNATIONAL, INC.; GRAND HOST, INC.; SHRI AMBICA, LLC; PACIFIC COAST INN, LLC CO.; PACIFIC COAST INN, LLC; STANDARD ESCONDIDO HOSPITALITY LLC; ESCONDIDO HOSPITALITY GROUP | Case No. 3:24-cv-00217-JLS-AHG<br><br>**PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

LLC; MOUNT VERNON INN LLC; JAI AMBE PHOENIX, LLC; ESA P PORTFOLIO LLC; ESH/HV PROPERTIES LLC; ESH HOSPITALITY INC.; ESA MANAGEMENT, LLC; and ESA P PORTFOLIO OPERATING LESSEE, LLC,

Defendants.

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff Jane Doe (C.M.S.), by and through the undersigned counsel, and respectfully submits her second amended complaint for damages and makes the following averments.

## SUMMARY

1. C.M.S. files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in hotels owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

3. Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] 18 U.S.C. §1591(e)(3).

Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7. As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like C.M.S., with minimal risk of detection or interruption.

8. Defendants continued supporting traffickers, including C.M.S.'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at their respective hotels and specifically at the 1.) Ramada Inn located at 2141 S. Harbor Blvd., Anaheim, CA 92802, the 2.) Super 8 located at 528 W. Washington Ave., Escondido, CA 92025, the 3.) Homewood Suites located at 10 W Trimble Road, San Jose, Ca 95131, the 4.) Roadway Inn located at 1103 N Coast Highway, Oceanside, CA 92054, the 5.) Comfort Inn located at 1290 W. Valley Parkway, Escondido, CA

92025, the 6.) Econo Lodge located at 515 W Washing St., Escondido, CA 92025, the 7.) Quality Inn located at 501 W Mission Ave., Escondido, CA 92025, the 8.) Extended Stay America located at 9880 Pacific Heights Blvd., San Diego, CA 92131, the 9.) La Quinta located at 27330 Jefferson Ave., Temecula, CA 92590, and the 10.) Wyndham Garden located at 3737 Sports Arena Blvd., San Diego, CA 92110. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## **PARTIES**

9. C.M.S. is a natural person who is currently a resident and citizen of Arizona.

10. C.M.S. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud, or coercion, to commit a commercial sex act.

11. All references to any Defendant include any department, division, office, agency, subsidiary, or corporate affiliate, whether domestic, foreign, and/or international of the Defendant. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf the Defendant now or at any time relevant to the claims herein.

## I. WYNDHAM HOTELS DEFENDANTS

12. Defendant Wyndham Hotels & Resorts, Inc. is a Delaware corporation with its principal place of business in New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803. Wyndham Hotels & Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. It retains successor liability for wrongful acts of its predecessor, Wyndham Worldwide Corporation, with regard to the operation of the Wyndham hotels identified in this lawsuit. All references to Wyndham Hotels & Resorts, Inc. in this Complaint include references to the acts and omissions of its predecessors.

13. Defendant Wyndham Hotel Group, LLC is a Delaware company with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803. Upon information and belief, Wyndham Hotel Group, LLC is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc. and a former subsidiary of Wyndham Worldwide Corporation.

14. All references to "Wyndham" in this Complaint include Wyndham Hotels & Resorts, Inc., and Wyndham Hotel Group, LLC, as well as their predecessor entities.

15. Upon information and belief, at all relevant times, Wyndham operated several hotel brands under the Wyndham umbrella. Wyndham did this both directly and through brand-specific subsidiaries owned and controlled by Wyndham. Wyndham

exercised centralized control over these brands, and specifically exercised such control as to aspects of operations relevant to Plaintiff's claims in this Complaint, including, but not limited to, by adopting a centralized response to detecting and responding to sex trafficking at Wyndham hotels as further outlined below.

### A.    Anaheim Ramada Inn

16.    Defendant Ramada Worldwide Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It may be served through its registered agent Corporate Creations Network In, 3260 N. Hayden Road #210, Scottsdale, AZ 85251. Upon information and belief, at all relevant times, it operated together with Wyndham to operate, manage, and control Wyndham hotels under the Ramada Inn brand.

17.    Wyndham and Ramada Worldwide, Inc., will be referred to collectively as "Ramada Franchisors" Upon information and belief, at all relevant times, Ramada Franchisors operated, controlled, and managed the Ramada Inn located at 2141 S. Harbor Blvd., Anaheim, CA 92802 ("Anaheim Ramada Inn") together with the franchisees for this hotel.

18.    Sant Kabir, LLC is a limited liability with its principal place of business at 12800 Center Court Dr., Suite 525, Cerritos, CA 90703.

19.    Sant Kabir, LLC may be served through its registered agent for service: Devang Patel, 12800 Center Court Dr., Suite 525, Cerritos, CA 90703.

20. Golden Bridge International Investment Inc. is a stock corporation with its principal place of business at 796 Captiva Circle, Corona, CA 92882.

21. Golden Bridge International Investment Inc. may be served with process through its registered agent for service: Yihong Shan, 796 Captiva Circle, Corona, CA 92882.

22. Defendants Sant Kabir, LLC and Golden Bridge International Investment Inc. will be referred to collectively as "Ramada Franchisees."

23. Upon information and belief, at all relevant times, the Ramada Franchisees acted together to own the Anaheim Ramada Inn and participate in the operation and management of this hotel with Ramada Franchisors.

**B. Escondido Super 8**

24. Super 8 Worldwide, Inc. ("S8W") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, S8W is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation. Upon information and belief, at all relevant times, it acted together with Wyndham to operate, manage, and control Wyndham hotels under the Super 8 brand.

25. Wyndham and S8W will be referred to collectively as "Super 8 Franchisors." Upon information and belief, Super 8 Franchisors operated, controlled,

and managed the Super 8 located at 528 W. Washington Ave., Escondido, CA 92025 ("Escondido Super 8") together with the franchisees for this hotel.

26. ARS Hospitality, LLC is a limited liability company with its principal place of business at 44 Molton St., San Francisco, CA 94123.

27. ARS Hospitality, LLC may be served through its registered agent for service: Savitaben R. Patel - 44 Moulton St. San Francisco, CA 94123.

28. Defendant ARS Hospitality, LLC will be referred to as "Super 8 Franchisees."

29. Upon information and belief, at all relevant times, the Super 8 Franchisees acted together to own the Escondido Super 8 and participated in the operation and management of this hotel with Super 8 Franchisors.

**C.    San Diego Wyndham Garden**

30. Defendants Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, will be referred to collectively as "Wyndham Garden Franchisors." Upon information and belief, they operated, controlled, and managed the Wyndham Garden located at 3737 Sports Arena Blvd., San Diego, CA 92110 ("San Diego Wyndham Garden") together with the franchisee.

31. Sports Arena Hotel Venture, L.P. is a limited partnership with its principal place of business at 910 Camino Del Mar, Suite A, Del Mar, CA 92014.

32. Sports Arena Hotel Venture, L.P. may be served through its registered agent for service: Patricia Lin, 910 Camino Del Mar, Suite A, Del Mar, CA 92014.

33. Defendant Sports Arena Hotel Venture, L.P. will be referred to as "Wyndham Garden Franchisee."

34. Upon information and belief, at all relevant times, Wyndham Garden Franchisee acted together to own the San Diego Wyndham Garden and to operate and manage this hotel together with the Wyndham Garden Franchisors.

35. The Ramada Inn Franchisors, Super 8 Franchisors, and Wyndham Garden Franchisors are referred to collectively as the "Wyndham Hotel Franchisors."

36. The Ramada Inn Franchisees, Super 8 Franchisees, and Wyndham Garden Franchisees are referred to collectively as the "Wyndham Hotel Franchisees."

## II. LA QUINTA HOTEL DEFENDANTS

37. La Quinta Franchising, LLC, is a Nevada Corporation with its principal place of business in Parsippany, New Jersey. Upon information and belief, it is currently a subsidiary of Wyndham and operates together with Wyndham to operate La Quinta-branded hotels under the Wyndham Brand. It may be served through its registered agent for service: Jennifer Lee, 7801 Folsom Boulevard, #202, Sacramento, CA 95826.

38. Defendant La Quinta Holdings Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It may be served through its

registered agent for service: Jennifer Lee, 7801 Folsom Boulevard, #202, Sacramento, CA 95826.

39. La Quinta Franchising, LLC, and La Quinta Holdings Inc. are referred to collectively as the "LQ Defendants."

40. Upon information and belief, in 2018, Wyndham purchased La Quinta's management and franchise businesses, including interest in numerous hotels in California, which it actively operates and controls. Upon information and belief, Wyndham is the successor in interest with respect to the operation of the La Quinta located at 27330 Jefferson Ave., Temecula, CA 92590 ("Temecula La Quinta"). Wyndham is responsible for the wrongful acts of the predecessor entities (and their agents and alter-egos) that operated, managed, and controlled the Temecula La Quinta. All references to Wyndham include any predecessor entities.

41. The LQ Defendants and Wyndham (in its capacity as successor entity) are referred to collectively as the "La Quinta Franchisors. Upon information and belief, at all relevant times the La Quinta Franchisors acted together to operate, control, and manage the Temecula La Quinta together with the franchisee for this hotel.

42. OHM Kareshver, Inc. is a limited liability with its principal place of business at 27330 Jefferson Ave., Temecula, CA 92590.

43. OHM Kareshver, Inc. may be served through its registered agent for service: Vimal Patel, 27626 Parkside Dr., Temecula, CA 92591.

44. Defendant OHM Kareshver Inc. will be referred to as "La Quinta Inn Franchisee."

45. Upon information and belief, the La Quinta Franchisee owned the Temecula La Quinta and operated and managed this hotel together with La Quinta Franchisors.

## III. HILTON HOTEL DEFENDANTS

46. Defendant Hilton Domestic Operating Company Inc. ("Hilton-Homewood Suites Franchisor") is a limited liability company incorporated under the laws of the State of Delaware with its principal place of business at 7930 Jones Branch Drive, Suite 1100, McLean, Virginia 22102.

47. Upon information and belief, at all relevant times, Hilton-Homewood Suites Franchisor—directly or through affiliates and predecessor entities—operated, controlled, and managed the Homewood Suites located at 10 W. Trimble Road, San Jose, CA 95131("San Jose Homewood Suites") together with the franchisees for this hotel.

48. Apple Eight Hospitality Management, Inc. is a stock corporation with its principal place of business at 814 E. Main St., Richmond, VA 23219.

49. Apple Eight Hospitality Management, Inc. may be served with process through its registered agent for service: Corporation Service Company, CSC Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Sacramento, CA 95833.

50. Defendant Apple Eight Hospitality Management, Inc. will be referred to as "Homewood Suites Franchisee."

51. Upon information and belief, at all relevant times, the Homewood Suites Franchisee owned the San Jose Homewood Suites and operated and managed the hotel together with the Hilton-Homewood Suites Franchisor.

## IV. CHOICE HOTELS DEFENDANTS

52. Defendant Choice Hotels International, Inc. ("Choice Hotels") is a Delaware corporation and can be served through its registered agent: Corporate Service Company, 251 Little Falls Dr., Wilmington, DE 19808.

53. Upon information and belief, at all relevant times, Choice Hotels operated several hotel brands under the Choice Hotels umbrella. Choice Hotels did this both directly and through brand-specific subsidiaries owned and controlled by Choice Hotels. Choice Hotels exercised centralized control over these brands, and specifically exercised such control as to aspects of operations relevant to Plaintiff's claims in this Complaint, including, but not limited to, by adopting an overall response to detecting and responding to sex trafficking at Choice Hotels as further outlined below.

### A. Escondido Comfort Inn

54. Upon information and belief, at all relevant times, Choice Hotels—directly or through affiliates and predecessor entities—operated, controlled, and

managed the Comfort Inn located at 1290 W. Valley Parkway, Escondido, CA 92029 ("Escondido Comfort Inn") together with the franchisees for this hotel.

55. Grand Host, Inc. is a stock corporation with its principal place of business at 405-461 W. Main St., Brawley, CA 92227.

56. Grand Host, Inc. may be served through its registered agent for service: Sabri Salim, 14120 Caminito Vistana, San Diego, CA 92130.

57. Shri Ambica, LLC is a limited liability company with its principal place of business at 1290 W. Valley Parkway, Escondido, CA 92029.

58. Shri Ambica, LLC, may be served with process through its registered agent for service: Rajesha Jaiswal, 1290 W. Valley Parkway, Escondido, CA 92029.

59. Defendants Grand Host, Inc. and Shri Ambica, LLC will be referred to collectively as "Comfort Inn Franchisees."

60. Upon information and belief, at all relevant times, the Comfort Inn Franchisees acted together to own the Escondido Comfort Inn and operate and manage the hotel together with Choice Hotels.

**B. Oceanside Rodeway Inn**

61. Upon information and belief, at all relevant times, Choice Hotels— directly or through affiliates and predecessor entities—operated, controlled, and managed the Rodeway Inn located at 1103 N. Coast Highway, Oceanside, CA 92054 ("Oceanside Rodeway Inn") together with the franchisees for this hotel.

62. Pacific Coast Inn, LLC Co. is a corporation with its principal place of business at PO Box 4209, Cerritos, CA 90703.

63. Pacific Coast Inn, LLC Co. may be served through its registered agent for service: Pravin Pranav, 6281 Beach Blvd., Suite 331, Buena Park, CA 90621.

64. Pacific Coast Inn, LLC is a limited liability company with its principal place of business at 1103 N. Coast Highway, Oceanside, CA 92054.

65. Pacific Coast Inn, LLC may be served with process through its registered agent for service: Pravin Pranav, 6281 Beach Blvd., Suite 331, Buena Park, CA 90621.

66. Defendants Pacific Coast Inn, LLC Co. and Pacific Coast Inn, LLC will be referred to collectively as "Rodeway Inn Franchisees."

67. Upon information and belief, at all relevant times, the Rodeway Inn Franchisees acted together to own the Oceanside Rodeway Inn and operate and manage the hotel together Choice Hotels.

**C. Escondido Econo Lodge**

68. Upon information and belief, at all relevant times, Choice Hotels—directly or through affiliates and predecessor entities—operated, controlled, and managed the Econo Lodge located at 515 W. Washington Ave., Escondido, CA 92025 ("Escondido Econo Lodge") together with the franchisees for this hotel.

69. Standard Escondido Hospitality LLC is a limited liability company with its principal place of business at 515 W. Washington St., Escondido, CA 92025.

70. All references to Standard Escondido Hospitality LLC include any department, division, office, agency, subsidiary, or corporate affiliate, whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Standard Escondido Hospitality LLC now or at any time relevant to the claims herein.

71. Standard Escondido Hospitality LLC may be served with process through its registered agent for service: K. Freeman Lee, 3550 Wilshire Blvd., Ste. 1110, Los Angeles, CA 90010.

72. Escondido Hospitality Group LLC is a limited liability company with its principal place of business at 515 W. Washington Ave., Escondido, CA 92025.

73. Escondido Hospitality Group LLC may be served with process through its registered agent for service: Harshanaben Patel, 3666 Pio Pico Drive, Carlsbad, CA 92008.

74. Defendants Standard Escondido Hospitality LLC and Escondido Hospitality Group will be referred to collectively as "Econo Lodge Franchisees."

75. Upon information and belief, at all relevant times, the Econo Lodge Franchisees acted together to own the Escondido Econo Lodge and operate and manage the hotel together with Choice Hotels.

### D. Escondido Quality Inn

76. Upon information and belief, at all relevant times, Choice Hotels—directly or through affiliates and predecessor entities—operated, controlled, and managed the Quality Inn located at 501 W. Mission Ave., Escondido, CA 92025 ("Escondido Quality Inn") together with the franchisees for this hotel.

77. Mount Vernon Inn LLC is a California limited liability company with its principal place of business at 5805 Yokohama Court, San Diego, CA 92120.

78. Mount Vernon Inn LLC may be served with process through its registered agent for service: Menketh "Mike" Yalda, 5805 Yokohama Court, San Diego, CA 92120.

79. Jai Ambe Phoenix, LLC is a limited liability company with its principal place of business at 14493 Old Creek Road, San Diego, CA 92131.

80. Jai Ambe Phoenix, LLC may be served with process through its registered agent for service: Nilesh Patel, 14493 Old Creek Rd., San Diego, CA 92131.

81. Defendants Mount Vernon Inn LLC and Jai Ambe Phoenix, LLC will be referred to collectively as "Quality Inn Franchisees."

82. Upon information and belief, at all relevant times, Quality Inn Franchisees acted together to own the Escondido Quality Inn and operate and manage the hotel together with Choice Hotels.

83. The Comfort Inn Franchisees, Rodeway Inn Franchisees, Econo Lodge Franchisees, and Quality Inn Franchisees are referred to collectively as the "Choice Franchisees."

## V. EXTENDED STAY AMERICA HOTEL DEFENDANTS

84. At all relevant times, the San Diego Extended Stay America was a corporate owned and operated property that was jointly owned, operated, managed, and controlled by affiliates under the Extended Stay America corporate umbrella.

85. ESA P Portfolio LLC is a Delaware limited liability company with its principal place of business at 11525 N. Community House Rd., Charlotte, NC 28277.

86. ESA P Portfolio LLC may be served with process through its registered agent for service: 1505 Corporation, National Registered Agents, Inc., 330 N. Brand Blvd., Glendale, CA 91203.

87. ESH/HV Properties LLC is a limited liability company with its principal place of business at 100 Dunbar St., Spartanburg, SC 29306.

88. ESH/HV Properties LLC may be served with process through its registered agent for service: 1505 Corporation National Registered Agents, Inc., 330 N. Brand Blvd., Glendale, CA 91203.

89. ESH Hospitality Inc. is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Upon information and belief, ESH Hospitality, Inc., is a successor in interest to Extended Stay America, Inc., as the result of a merger

between the entities and is liable for the acts and omissions of Extended Stay America, Inc. and its affiliates related to the operation of the San Diego Extended Stay America. ESH Hospitality, Inc. was involved in the ownership, operation, and control of the San Diego Extended Stay America both directly and through predecessor entities for which it is liable.

90. ESA Management, LLC, is a Delaware limited liability company with a principal place of business in Charlotte, North Carolina. It can be served through its registered agent: Amanda Garcia, 330 N. Brand Blvd. Glendale, California 91203.

91. ESA P Portfolio Operating Lessee, LLC, is a Delaware limited liability company with a principal place of business in Charlotte, North Carolina. It can be served through its registered agent: Amanda Garcia, 330 N. Brand Blvd. Glendale, California 91203.

92. Defendants ESA P Portfolio LLC, ESH/HV Properties LLC, ESH Hospitality Inc., ESA Management, LLC, and ESA P Portfolio Operating Lessee, LLC, will be referred to as "ESA" or "ESA Defendants."

93. Upon information and belief, the ESA Defendants are corporate affiliates subject to common ownership and control.

94. Upon information and belief, at all relevant times, the ESA Defendants, directly or through their affiliates and/or successors, acted together to own, operate, manage, and control the San Diego Extended Stay America.

## JURISDICTION AND VENUE

95.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

96.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Southern District of California, and all Defendants are residents of California.

97.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of California.

98.     C.M.S. was trafficked in this District and Division.

## FACTS

### I.     C.M.S. WAS A VICTIM OF UNLAWFUL SEX TRAFFICKING AT HOTELS OWNED, OPERATED, MANAGED, AND CONTROLLED BY DEFENDANTS.

99.     C.M.S.'s trafficking began in 2013. She had multiple traffickers in the years she was trafficked. Her traffickers controlled her through physical violence and force and made her engage in commercial sex acts for their financial benefit. All of her traffickers forced her to post ads of herself and posted ads on her behalf. She did not want to engage in commercial sex acts but when she refused, they threatened her. While under the control of her traffickers, she was repeatedly beaten, drugged, sexually assaulted, and mentally abused.

100. C.M.S. remained under the continuous control of her traffickers through at least 2015.

101. C.M.S.'s traffickers continuously trafficked her, including at hotels throughout California. During this trafficking, the traffickers followed a common *modus operandi* and used methods and tactics that followed common patterns among traffickers. As a result, there were obvious signs of this trafficking that matched up with "red flags" that the hotel industry was aware of and that made this trafficking readily detectable to Defendants.

102. In February of 2014, C.M.S. was repeatedly trafficked at the Anaheim Ramada Inn.

103. In January through May of 2014, C.M.S. was repeatedly trafficked at the Escondido Super 8.

104. In March 2015 through June 2015, C.M.S. was trafficked at the San Diego Wyndham Garden.

105. The Anaheim Ramada Inn, Escondido Super 8, and San Diego Wyndham Garden are referred to collectively as the "Subject Wyndham Hotels" or "Subject Wyndham Properties."

106. In October 2014 through March 2015, C.M.S. was trafficked at the Temecula La Quinta.

107. In February 2014 through September 2014, C.M.S. was repeatedly trafficked at the San Jose Homewood Suites.

108. In January 2014 through March 2014, C.M.S. was repeatedly trafficked at the Escondido Comfort Inn.

109. In April 2014, C.M.S. was repeatedly trafficked at the Oceanside Rodeway Inn.

110. In August 2014 through November 2014, C.M.S. was trafficked at the Escondido Econo Lodge.

111. In April 2014 through June 2014, Jane Doe (C.M.S) was trafficked at the Escondido Quality Inn.

112. The Escondido Comfort Inn, Oceanside Rodeway Inn, Escondido Econo Lodge, and Escondido Quality Inn are collectively referred to as the "Subject Choice Hotels" or "Subject Choice Properties."

113. In July 2014, Jane Doe (C.M.S) was trafficked at the San Diego Extended Stay America.

114. C.M.S.'s traffickers brought her to each of these hotels for the express purpose of forcing her to engage in commercial sex for their financial benefit.

115. Despite the open and obvious signs of her trafficking, each of the Defendants benefited from facilitating her trafficking at its respective hotel(s). Throughout this Complaint, the term "respective hotel" or "respective hotel(s)" means:

a.  The Anaheim Ramada Inn is the respective hotel property of the Ramada Inn Franchisees and Ramada Inn Franchisors.

b.  The Escondido Super 8 is the respective hotel property of the Super 8 Franchisees and the Super 8 Franchisors.

c.  The San Diego Wyndham Garden is the respective hotel property of the Wyndham Garden Franchisees and Wyndham Garden Franchisors.

d.  The Temecula La Quinta is the respective hotel property of the La Quinta Franchisees and La Quinta Franchisors.

e.  The San Jose Homewood Suites is the respective hotel property of the Hilton-Homewood Suites Franchisee and Hilton-Homewood Suites Franchisor.

f.  The Escondido Comfort Inn is the respective hotel property of Comfort Inn Franchisees and Choice Hotels.

g.  The Oceanside Rodeway Inn is the respective hotel property of the Rodeway Inn Franchisees and Choice Hotels.

h.  The Escondido Econo Lodge is the respective hotel property of the Econo Lodge Franchisees and Choice Hotels.

i.  The Escondido Quality Inn is the respective hotel property of the Quality Inn Franchisees and Choice Hotels.

j.  The San Diego Extended Stay America is the respective hotel property of the Extended Stay America Defendants.

116.  Each of the franchisor defendants, in addition to being directly responsible for its own acts and omissions operating its respective hotel(s) is **also** vicariously liable for the acts and omissions of its respective franchisee(s) under principles of actual agency. Throughout this Complaint, the term "respective franchisee(s)" or "respective franchisee" means the franchisee involved in the operation of the same "respective hotel" as outlined in the previous paragraph.

II.  **THE HOTEL INDUSTRY'S ROLE IN SEX TRAFFICKING AND DEFENDANTS' KNOWLEDGE OF THE PROBLEM.**

117. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of C.M.S.

118. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[3] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[4] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex

---

[3] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us- slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[4] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save a Trafficking Victim's Life with Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

trafficking taking place at hotels.[5] Hotels have been found to account for over 90% of commercial exploitation of children.[6]

119.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

120.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[7]

---

[5] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[6] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[7] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*,

121. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[8]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

---

https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).
[8] *See Id.*

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

122. Other commonly recurring signs of sex trafficking at a hotel include the use of cash or a prepaid card to pay for a room, refusal of housekeeping services for multiple days, requesting housekeeping services (such as new linens or sheets) but refusing hotel staff access to the room, frequent use of a "Do Not Disturb" sign, finding large amounts of cash or sex paraphernalia in a room, the smell of bodily fluids or musk, the same person reserving multiple rooms, unusual traffic patterns to and from a room, individuals loitering in hallways or common areas who appear to be monitoring the area, evidence of illegal drugs or excessive alcohol use, excessive use of hotel computers for adult-oriented websites, cars in parking lots are parked so license plate is not visible, presence of multiple cellphones or computers, and an extended stay booked without significant personal possessions in the hotel.[9]

---

[9] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.;

123. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

124. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[10] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

125. The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[11] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

126. The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a

www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf
[10] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[11] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[12]

127. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

128. All Defendants were specifically aware that commercial sex in a hotel environment, involving a "pimp," often is related to sex trafficking. Defendants received training and guidance on this. Defendants knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of potential trafficking. Reasonable diligence required Defendants to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

---

[12] *Id.*

129. The most effective weapon against sexual exploitation and human trafficking is education and training.[13] As ECPAT concluded:

The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[14]

130. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[15] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

131. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a

[13] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[14] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[15] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

132. There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

133. Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking. For example:

- Wyndham has recognized their "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[16] Wyndham has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[17]

- Choice Hotels' Board of Directors has been discussing human trafficking issues since at least 2008 when they adopted a Human Rights Policy that condemns human trafficking and publicly commits to raising awareness among hotel staff about trafficking in its hotels.[18]

- Choice Hotels that they started supporting Polaris, a leading non-profit in the fight against trafficking, in 2010.[19] Upon information and belief, prior to C.M.S.'s trafficking period, Choice Hotels had reviewed and were familiar with Polaris publications regarding trafficking in the hospitality industry, which include detailed recommendations for how hotels can respond to trafficking.

134. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

135. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before C.M.S.'s trafficking, that sex trafficking was ongoing and widespread at their branded properties including the subject properties.

[16] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[17] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[18] https://www.Choice Brand Defendantshotels.com/about/responsibility/human-rights-policy
[19] https://www.Choice Brand Defendantshotels.com/about/responsibility/human-rights-policy

136. Unfortunately for C.M.S., the promises made by the Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like C.M.S.

### III. C.M.S.'S SEX TRAFFICKING AT THE SUBJECT WYNDHAM HOTELS.

#### A. The Wyndham Hotel Franchisors knew that sex trafficking was a widespread problem at Wyndham hotels.

137. Use of Wyndham branded properties, including Ramada, Super 8, and Wyndham Garden properties, for sex trafficking is well known to the Wyndham Hotel Franchisors.

138. Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[20] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[21] However,

[20] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[21] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[22]

139. Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[23]

140. The problem of sex trafficking at Wyndham properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotel staff from supporting child sex trafficking.[24] Although Wyndham publicly committed to taking steps to stop facilitating trafficking, this promise proved empty; Wyndham has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[25]

---

[22] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023

[23] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

[24] https://www.change.org/p/stop-wyndham-hotel-staff-from-supporting-child-sex-trafficking-in-wyndham-hotels

[25] https://endsexualexploitation.org/wyndham/

141. Sex trafficking was prominent at Wyndham branded properties, including Super 8, Ramada, and Wyndham Garden properties. Public information, including scores of news stories and online reviews, confirms both the widespread sex trafficking problem at Wyndham branded hotels and the Wyndham Brand Franchisors' knowledge and understanding of the problem.

142. In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[26]

143. Examples of notable press involving the frequent use of Wyndham branded hotels for illegal activity, including sex trafficking, include for Ramada:

- In June 1987 a federal grand jury indicted 16 persons on charges stemming from alleged participation in an interstate prostitution ring working out of hotels including a Rockville, Maryland Ramada Inn.[27]

- In September 2009, police discovered a prostitution ring at the Ramada Inn on Roosevelt Boulevard in Philadelphia. Police looking for a defendant in a drug case discovered 11 women. Some of the women

[26] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

[27] Victoria Churchville, 16 INDICTED IN PROSITUTION RING THAT USED PAGERS, POSH HOTELS, The Washington Post, (June 19, 1987), https://www.washingtonpost.com/archive/local/1987/06/19/16-indicted-in-prostitution-ring-that-used-pagers-posh-hotels/c984c86e-6ecf-42ee-bb55-cbc980dab948/

reported that they were being held against their will and sexually assaulted.[28]

- In May 2010, Waterloo, Iowa Police followed used a Craigslist ad and made arrangements to meet females for sex at the local Ramada Inn. Police arrested two.[29]

- In February 2010, police in Burbank, California arrested three at the Ramada Burbank Airport Hotel on charges of prostitution as part of their effort to curb the sex trade.[30]

- In June 2012 Beaverton, Oregon police made an arrest at a Ramada Inn Northeast Portland in connection with a nationwide FBI sex trafficking sting.[31]

- In July 2012, East Hartford's "Hot Spot Unit" conducted a sting at at the Ramada Inn on Roberts Street in Hartford, Connecticut where it arrested a man for promoting prostitution and 6 women on charges of prostitution.[32]

---

[28] *Possible prostitution ring discovered at Boulevard Ramada*, WHYY PBS (Sept. 8, 2009), https://whyy.org/articles/possible-prostitution-ring-discovered-at-boulevard-ramada/

[29] *Police make Prostitution Arrests*, Waterloo Police Department, https://www.waterloopolice.com/press-release/654-police-make-prostitution-arrests.html

[30] Olsen Ebright, Burbank Hookers, Beware, NBC 4 Los Angeles, (Mar. 3, 2010), https://www.nbclosangeles.com/news/local/burbank-prostitution/1867548/

[31] *Beaverton police arrest two in nationwide, FBI sex trafficking sting*, The Oregonian, (Jun. 26, 2012), https://www.oregonlive.com/beaverton/2012/06/beaverton_police_arrest_two_in.html

[32] *East Hartford Police Arrest Seven on Prostitution Charges*, Harford Courant, (Jul. 26, 2012), https://www.courant.com/community/hartford/hc-xpm-2012-07-27-hc-east-hartford-prostitution-arrests-0728-20120727-story.html

- In January 2013 two women were arrested on suspicion of prostitution at the Ramada Inn Burbank in Burbank, CA.[33]

- In April 2013, police found an underage girl in a room where prostitution was believed to be occurring at a Tampa, Florida Ramada Inn. A twenty-five-year-old woman fled the scene. She was later arrested on charges of procuring a person under 18 for the purpose of prostitution, deriving support from the proceeds of prostitution and renting space to be used for prostitution.[34] She was later convicted of charges of trafficking three underage teens, including a 16-year-old girl and a 14-year-old boy.[35]

- In November 2013, an investigation into prostitution ring, led to the arrest of five people and the seizure electronic equipment at the Ramada Inn in La Vergne, Tennessee.[36]

- In March 2014, undercover police raided a room at the Ramada Inn on Roosevelt Boulevard in Philadelphia arresting a woman for solicitation of prostitution and a man for suspected drug dealing.[37]

[33] *Two women arrested on suspicion of prostitution at Burbank Ramada Inn*, Burbank Leader (Feb. 1, 2013), https://www.latimes.com/socal/burbank-leader/the818now/tn-818-0201-two-women-arrested-on-suspicion-of-prostitution-at-burbank-ramada-inn-story.html

[34] Kristin Weber, Woman accused of recruiting minor for prostitution, 10 Tampa Bay, (Apr. 2, 2013), https://www.wtsp.com/article/news/local/woman-accused-of-recruiting-minor-for-prostitution/67-326688993

[35] Dan Sullivan, Tampa woman gets 15 years in prison for recruiting teens for prostitution, Tampa Bay Times, (Nov. 11, 2016), https://www.tampabay.com/news/courts/criminal/tampa-woman-gets-15-years-in-prison-for-recruiting-teens-for-prostitution/2302520/

[36] Marie Kemph, Police: Drugs seized in prostitution ring raid, Murfreesboro Post, (Nov. 27, 2017), https://www.murfreesboropost.com/news/police-drugs-seized-in-prostitution-ring-raid/article_5ed959b6-fe72-52ee-bcc8-401c8f28d986.html

[37] *Undercover cops make prostitution, drug arrests* Northeast Times (Mar. 20, 2014), https://northeasttimes.com/2014/03/20/undercover-cops-make-prostitution-drug-arrests/

- In April 2014, police in Rock Hill, North Carolina, as part of a prostitution sting that netted five, made arrests at the Ramada Inn. In total the arrests included three women and two men.[38]

- In June 2014, the mother of a mentally ill woman who police say was killed after meeting for sex at a Ramada Inn in College Park, Maryland said her daughter was mentally ill and was pimped by men via computer ads.[39]

- In September 2014, police in Parsippany, New Jersey – the same city Wyndham maintains its principal place of business - arrested a man and a woman in at a Ramada Inn only 12 minutes from Wyndham's corporate office on charges of theft and prostitution.[40]

- In March 2015, police arrested a woman who was renting a room at the Ramada Inn in Wayne, New Jersey for prostitution.[41]

- In April 2015, a woman was arrested on prostitution and drug charges by an undercover police officer in a sting at a Whitehall, Pennsylvania Ramada Inn.[42]

- In August 2015, at least 20 people were arrested in a prostitution sting conduced at a Des Moines, Iowa Ramada by Wyndham as part of an

[38] *Five arrested in prostitution sting at two Rock Hill motels, police say*, WBTV, (Apr. 24, 2014), https://www.wbtv.com/story/25330215/five-arrested-in-prostitution-sting-at-two-rock-hill-motels-police-say/

[39] Darcy Spencer, Mother of Motel Murder Victim: "She's Not a Prostitute," 4 Washington, (Jun. 8, 2014), https://www.nbcwashington.com/news/local/mother-of-motel-murder-victim-denies-daughter-was-a-prostitute/59771/

[40] William Westhoven, Stolen purse at Kmart leads to prostitution bust, Daily Record, (Sept. 7, 2014), https://www.dailyrecord.com/story/news/local/2014/09/07/stolen-purse-kmart-leads-prostitution-bust/15192421/

[41] Natalie Mieles, Prositution Arrest Made N Wayne Hotel, Patch, (Mar. 23, 2015), https://patch.com/new-jersey/wayne/prostitution-arrest-made-wayne-hotel-0

[42] Manuel Gamiz, Jr., Woman faces prosecution, drug charges after sting at Whitehall hotel, The Morning Call, (Apr. 23, 2015), https://www.mcall.com/news/breaking/mc-c-whitehall-hotel-prostitution-arrest-20150423-story.html

operation that began as a result of complaints from local business owners and citizens.[43]

- In December 2015 Hanover County, North Carolina District Attorney issued an admonishment to a Ramada Inn on Market Street, Wilmington, North Carolina, among others, for, "repeated acts which create and constitute a breach of the peace, including but not limited to prostitution, assaults, fights, and discharging firearms."[44]

- In February 2016, a Franklin, Tennessee Police Department used Backpage.com as part of a sting operation that lead to the arrest of a woman at the Ramada Inn on charges of prostitution, and possession of drug paraphernalia.[45]

144. Defendants also knew sex trafficking was occurring at their Super 8 hotels, for example:

- In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Super 8 in California.[46]

- In November 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Super 8 Motel in Virginia.[47]

---

[43] Grant Rodgers and Kim Norvell, More arrests as prostitution stings continue, Des Moines Register, (Aug. 19, 2015), https://www.desmoinesregister.com/story/news/crime-and-courts/2015/08/19/urbandale-businessman-charged-prostitution/31987431/

[44] *DA, police chief focus on motel crime on Market Street*, Star News Online, (Jan. 10, 2016), https://www.starnewsonline.com/story/news/2016/01/10/da-police-chief-focus-on-motel-crime-on-market-street/30994128007/

[45] Zach Harmuth, Nolensville Woman Arrested in Prostitution Sting Awaits Court, Williamson Source, (Feb. 5, 2016), https://williamsonsource.com/nolensville-woman-arrested-prostition-sting-awaits-court/

[46] https://www.wired.com/2010/11/epps/

[47] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011)

- In January 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Florida Super 8 Motel.[48]

- In June 2011, an MS-13 gang member was indicted for trafficking girls at a Super 8 Motel near Washington, D.C.[49]

- In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Super 8.[50] In December 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Super 8 Motel in Oklahoma.[51]

- In April 2013, two were arrested for trafficking a juvenile girl at an Illinois Super 8.[52]

- In June 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Super 8 Motel.[53]

- A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Super 8 Motel.[54]

---

https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671

[48] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm

[49] https://www.thepublicdiscourse.com/2011/10/4034/

[50] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635

[51] Man faces new sex-trafficking charges, Tulsa World (Oklahoma ) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671

[52] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-at-motel/article_98edf1d4-d231-5ea1-a6b9-e71c83f44750.html

[53] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle

[54] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction

- In 2013, a man was arrested at a Super 8 in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[55]

- In September 2013, a Super 8 motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[56]

- In November 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Super 8 Motel in Texas.[57]

- In June 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Super 8.[58]

145. Examples of notable press involving the frequent use of other Wyndham-branded hotels for illegal activity, include:

- In June 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Wyndham branded hotel in Hartford, Connecticut.[59]

- In February 2012, a man was arrested by FBI agents and members of the Human Trafficking Task Force on charges of sex trafficking of children

[55] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficing-investigation
[56] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sex-trafficking-in-mass-teens-disappearance-ece/35397014007/
[57] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php
[58] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old
[59] *East Hartford Woman Sentenced to 9 Years in Prison for Sex Trafficking Of Two 14-Year-Old Girls*, Hartford Courant (June 24, 2011), https://www.courant.com/2011/06/24/east-hartford-woman-sentenced-to-9-years-in-prison-for-sex-trafficking-of-two-14-year-old-girls/.

for pimping out a 14-year-old girl who was rescued from a Wyndam hotel in Florida.[60]

- In 2012, the first successful prosecution of a human trafficking case in Wisconsin occurred after a man trafficking a woman at a Wyndam branded hotel in Wausau, Wisconsin.[61]

- Three people were arrested in July 2014 in Fayetteville on human trafficking charges after holding a woman captive at a Wyndham branded hotel.[62]

- In July 2014, three people were arrested and accused of kidnapping and torturing a woman for human trafficking out of a Wyndham branded hotel in Orange County, CA.[63]

- In September 2014, two Nevada residents were arrested on sex trafficking charges. Officers set up surveillance at a Wyndham branded hotel in Nashville and "it did not take long for officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[64]

- In April 2015, a Philadelphia man was sentenced for sex trafficking minors. The man worked as a security guard at a Wyndham branded hotel

[60] Alexandra Seltzer, Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14, The Palm Beach Post (Feb. 7, 2012), https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/.

[61] Shereen Siewert, *Sex-trafficking cases hard to crack in Wisconsin*, Post Crescent (March 25, 2014), https://www.postcrescent.com/story/news/2014/03/25/sex-trafficking-cases-hard-to-crack-in-wisconsin/6884671/.

[62] Three arrested on human trafficking charges in NC, Fox8 (July 2, 2014), https://myfox8.com/news/three-arrested-on-human-trafficking-charges-in-nc/.

[63] Jeanne Kuang, Three Accused of Kidnapping, Torturing Woman for Human Trafficking in Orange County, NBC Los Angeles (July 30, 2014), https://www.nbclosangeles.com/news/three-accused-of-brutally-kidnapping-torturing-woman-for-human-trafficking-in-orange-county/65718/.

[64] Las Vegas Man, Woman Jailed on Prostitution Charges, City of Franklin, TN (Sept. 5, 2014), https://www.franklintn.gov/Home/Components/News/News/2563/.

in Philadelphia and "provided protection and assistance to sex traffickers operating at the motel in exchange for a daily fee."[65]

- In June 2015, two Brooklyn men charged with sex trafficking allegedly forced a teenage girl into prostitution from a Long Island City Wyndham branded hotel.[66]

- In July 2015, after investigating possible prostitution at a Wyndham-branded hotel in Maryland, Frederick County sheriff's deputies charged a Hagerstown man with human trafficking after two teenage girls were forced into prostitution.[67]

- In March 2016, a 22-year-old Sandy Springs man was arrested in Athens, Ga., and charged with pimping a person under 18 and sex trafficking after holding a 16-year-old against her will at a Wyndham branded hotel in Athens and forcing her to engage in sex in exchange for money.[68]

146. These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham hotels. Moreover, on information and belief, the Wyndham Hotel Franchisors were aware of

---

[65] Philadelphia Man Sentenced for Sex Trafficking Conspiracy, U.S. Attorney's Office (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy.

[66] Jackie Strawbridge, *Cuffed Brooklyn Men Allegedly Pimped At LIC Hotel*, licpost (June 9, 2015), https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel.

[67] Jeremy Arias, *Hagerstown man charged with trafficking of two teenage girls*, The Frederick News-Post (July 1, 2015), https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/.

[68] Dyana Bagby, Sandy Springs man arrested in Athens, Ga., for sex trafficking, RoughDraft atlanta (March 24, 2016), https://roughdraftatlanta.com/2016/03/24/sandy-springs-man-arrested-athens-ga-sex-trafficking/.

additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

147. Ultimately, several hundred of traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of Wyndham branded properties.

148. Upon information and belief, the Wyndham Hotel Franchisors monitored criminal activity occurring at Wyndham branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific properties where C.M.S. was trafficked.

149. Similarly, Defendants knew sex trafficking was occurring at their hotels through publicly available online review websites, which are regularly reviewed by companies such as Defendants. For example, for Ramada locations:

- In December 2007 regarding the Ramada Inn in Toms River, New Jersey, in a review titled, "Hookers, Drugs, and poor service," a reviewer wrote "[a]s my wife and I went to our room, we were first asked for money from some guy in the hallway, then a prostitute informed us for a fee, she would join us…."[69]

- In February 2010 regarding the Ramada by Wyndham in Rochelle Park, New Jersey, a reviewer wrote, "[t]hin walls, so EVERYTHING was heard, especially when some pimp was yelling & cursing at his

[69] https://www.tripadvisor.co.uk/ShowUserReviews-g46870-d98468-r11235472-Ramada_by_Wyndham_Toms_River-Toms_River_New_Jersey.html

"employee" from 1am till 4 am. The clientele were mostly thugs & one-night-standers."[70]

- In September 2010 regarding the Ramada by Wyndham Pikesville/Baltimore North, a customer complained, "[a]nd to top it all off, we were awakened at 2 AM by a large party of about 25 young people outside the room, some of whom were apparently prostitutes--young girls in skimpy clothes talking to men through car windows." The General Manager replied but did not address the prostitution complaint.[71]

- A November 2010 review regarding a Ramada in Seattle, Washington states "Basically if you like Prostitutes and Drug Dealers this is your place, The place is managed by a Very Young Arrogant Manager and his response to my complaints was everyone deserves a second chance, not to mention the noise."[72]

- A June 2011 review of a Ramada Inn in Costa Mesa, CA states "Wow this "hotel" is horrible…We were on the 3rd floor which was the quietest. Swore we saw 2-3 prostitutes walking around outside."[73]

- An October 2011 review of a Ramada in Bangor, ME states "About 1 in the morning there was a group of drunk people in the hallways running up and down the halls and slamming doors. I called the front desk and they said they would send someone up to check on it, however, the slamming continued for over an hour and a half. I also saw a man bringing a prostitute to his room down the hall where they had a "noisy" encounter."[74]

---

[70] https://www.tripadvisor.com/ShowUserReviews-g46782-d92577-r55266477-Ramada_by_Wyndham_Rochelle_Park_Near_Paramus-Rochelle_Park_New_Jersey.html
[71] https://www.tripadvisor.com/ShowUserReviews-g41317-d250631-r80299255-Ramada_by_Wyndham_Pikesville_Baltimore_North-Pikesville_Maryland.html
[72] https://www.tripadvisor.com/Hotel_Review-g58732-d224851-Reviews-Ramada_by_Wyndham_SeaTac_Airport-SeaTac_Washington.html
[73] https://www.yelp.com/biz/ramada-by-wyndham-costa-mesa-newport-beach-costa-mesa
[74] https://www.tripadvisor.com/Hotel_Review-g40502-d93532-Reviews-Bangor_Grande_Hotel_Conference_Center-Bangor_Maine.html

- A September 2011 review regarding a Ramada Inn in Reno, Nevada states "One word... EEWWWWW! Hookers are outside courting truck drivers. Meth heads are going in and out the doors looking for thier next fix. Desk man wasnt anywhere to be found for check-in."[75]

- In October 2011 regarding the Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[w]as there any prostitution at the hotel? Maybe.  But the pimps in the lobby always held the door for us…."[76]

- A May 2012 review of a Ramada in Denver, CO states "Definitely not safe as we witnessed actual drug deals and sex trade going on in back. The front desk staff was too busy flirting with each other to be helpful."[77]

- In June 2012 regarding the Ramada by Wyndham in East Orange, New Jersey, in a review titled, "It Is As Bad As They Say," a reviewer wrote, "[v]isible prostitutes going up and down the hall."[78]

- In September 2012 regarding the Ramada by Wyndham in Wyndham's home town of Parsippany, New Jersey, a reviewer advised, "[p]lease avoid this hotel at all costs unless you're a trucker or prostitute."[79]

- An October 2012 review of a Ramada Inn in Gainesville, FL states "Do NOT stay here. In disrepair, dirty, and a hub for drugs and prostitution. Hotels.com should not represent this hotel."[80]

---

[75] https://www.yelp.com/biz/ramada-by-wyndham-reno-hotel-and-casino-reno

[76] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r119573653-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html

[77] https://www.tripadvisor.com/Hotel_Review-g33388-d85325-Reviews-Ramada_by_Wyndham_Denver_Downtown-Denver_Colorado.html

[78] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r132718173-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html

[79] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r141158336-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html

[80] https://www.expedia.com/Gainesville-Hotels-Motel-6-Gainesville.h918788.Hotel-Reviews

- In November 2012 regarding the Ramada Limited in Cockeysville, Maryland, a reviewer wrote, "seems to be mainly a place for hooker hookups and not somewhere anyone actually stays."[81]

- A November 2012 review of a Ramada in Portland, Oregon states "First of all this place is disgusting. It is full of pimps and hoes and DRUGS :/."[82]

- In March 2013 regarding the Ramada by Wyndham Baltimore West in Baltimore, Maryland, a reviewer, in a review titled "Prostitute plaza," wrote, "[o]ur second evening we were confronted by ladies who were at the time selling themselves to us. As we walked to our car the next morning we were once confronted again by 2 different professional women advancing sexual and in appropriate verbiage to my 18 year old son."[83]

- A March 2013 review of a Ramada Inn in Bowling Green, Kentucky states "I noticed a woman wearing over the knee leather boots standing in front of the hotel, after I had checked in. She was obviously waiting to be "picked up"…If you are looking for hookers, this is the place to go!"[84]

- In August 2013 regarding Ramada by Wyndham West Atlantic City in Atlantic City, New Jersey, a reviewer reported, "a load of police cars because there was a prostitution raid…." The hotel's webmaster replied saying they appreciated the review and observations.[85]

- In September 2013 regarding the Ramada by Wyndham in Yonkers, New York, a reviewer complained, "[a]ll night…drugs and prostitution

[81] https://www.tripadvisor.com/ShowUserReviews-g41075-d93714-r146214352-Ramada_Limited_Cockeysville-Cockeysville_Maryland.html
[82] https://www.tripadvisor.com/Hotel_Review-g52024-d96118-Reviews-Ramada_by_Wyndham_Portland_Airport-Portland_Oregon.html
[83] https://www.tripadvisor.co.nz/ShowUserReviews-g41045-d93846-r154472777-Ramada_by_Wyndham_Baltimore_West-Catonsville_Maryland.html
[84] https://www.tripadvisor.com/Hotel_Review-g39214-d92797-Reviews-Ramada_by_Wyndham-Bowling_Green_Kentucky.html
[85] https://www.tripadvisor.com/ShowUserReviews-g46742-d98115-r174159963-The_Ramada_Atlantic_City_West-Pleasantville_New_Jersey.html

business is going on there with the knowledge of the staff and managers....”[86]

- In February 2014 regarding the Ramada by Wyndham in East Orange, New Jersey, a concerned citizen reported, “[t]here is also a revolving door of prostitution going on at the Ramada Inn” in East Orange, New Jersey on a message board.[87]

- A March 2014 review of a Ramada Inn in Reno, Nevada states “As I entered the hotel I immediately noticed the type of clients they have. I seriously think is like a pimp/prostitute warehouse.”[88]

- An April 2014 of a Ramada in Alpharetta, GA states “The manager checked me in and on my way to the suit, two ladies drunk, smoking at the elevator, went into room and room was smelling old, a/c was not working effectively, no proper lighting in the room, after a while I went to sleep and some one came knocking on the door at abt 2 AM in the night, I was scared and looked through eye piece from the door, a man (supposedly a pimp) and a girl were just knocking all the doors to ask if anyone wants to have sex with that lady, I then called the desk and no one bothered to answer my cal.....waited, calmly went back to bed! later, that morning, complained about the incident and the desk manager doesnt respond properly, poor communication....I wont recommend this to any one!!!”[89]

- In May 2014 regarding the Ramada by Wyndham Baltimore West, in Baltimore, Maryland a reviewer reported, “[a] big complaint was what appeared to be a prostitute going in and out of the room next to ours every 45 minutes or so and having relatively loud sex all night.”[90]

- In November 2014 regarding the Ramada by Wyndham Waukegan/Great Lakes in Waukegan, Illinois, a reviewer noted, “I encountered the back

[86] https://www.tripadvisor.com/ShowUserReviews-g48922-d93875-r175810200-Ramada_by_Wyndham_Yonkers-Yonkers_New_York.html

[87] https://seeclickfix.com/issues/928962-dangerous-elevator-ramada-inn

[88] https://www.yelp.com/biz/ramada-by-wyndham-reno-hotel-and-casino-reno

[89] https://www.tripadvisor.com/Hotel_Review-g35235-d123989-Reviews-Ramada_by_Wyndham_Alpharetta-Roswell_Georgia.html

[90] https://www.tripadvisor.co.nz/Hotel_Review-g41045-d93846-Reviews-Ramada_by_Wyndham_Baltimore_West-Catonsville_Maryland.html

PLAINTIFF’S SECOND AMENDED COMPLAINT

door propped open on several occasions and different men pulling up in numerous vehicles, staying for a half hour or less each time. I called the front desk and reported this and was told the one man security would handle it. He didn't. Condoning prostitution is grounds for business license revocation or suspension." Regarding prostitution, the Manager replied, "We never condone any illegal activities, have overnight security to assure the peace of all our guests, and cooperate fully with local law enforcement immediately should we encounter any illegal activities." [91]

- A June 2015 review of a Ramada Inn in Manchester, Tennessee states "The place looked pretty bad but when I went to the door of my room, I realized that there were pimps and their 'ladies' hanging out around the doorways. I went into my room and eventually pulled the bed cover back and got a big surprise. There was blood all over the sheets! Someone had bled on the bed and then pulled the sheet back over itâ€¦probably very soon before I checked into this hotel. When I complained to the front desk clerk about it, she affected not to know what was going on and complained about my attitude. She didn't like it that I was mad about hookers bleeding all over the bed I was supposed to sleep in. She said she had no idea that this was going on, that she was just the clerk wink, wink. Unless you are a customer for prostitutes, avoid this place like the plague."[92]

- In a July 2015 review of a Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[o]n the way back to our room, my husband heard a prostitute making "deals" with her clients. The foot traffic is heavy within this hotel, and now it makes sense. If you're looking for a prostitute, then this is the place to be, but this is not a family friendly hotel." The General Manager replied but did not address the concerns regarding prostitution.[93]

- In August 2015 regarding the Ramada by Wyndham Parsippany in Wyndham's home town of Parsippany, New Jersey, a reviewer titled their

[91] https://www.tripadvisor.com/ShowUserReviews-g36854-d90331-r239174515-Ramada_by_Wyndham_Waukegan_Great_Lakes-Waukegan_Lake_County_Illinois.html

[92] https://www.tripadvisor.com/Hotel_Review-g55181-d104564-Reviews-Quality_Inn-Manchester_Tennessee.html

[93] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r294451091-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html

review, "Do NOT Feel SAFE Here Anymore-- has Become a HOTSPOT for Prostitution!!-," and wrote, "FIRST ALL DOORS Of the Hotel are "Open" to ANYONE walking from the Streets…Arriving back to my Room one evening at 1A, watching cars parking, then Various men Walking Right into the hotel. When I Went into End main door), I Was Absolutely Scared to Death Noticing a Man Crouched down Behind The STAIRS!!!! "Obviously Waiting His Turn" Hearing him Say "I am here". "I am Inside". The TRAFFIC Coming and Going Just that ONE NIGHT Was unbelieveablofe. It Became OBVIOUS That PROSTITUTION Had Become Quite POPULAR At This Hotel, It Was like a "Rats Nest", Men Walking in all hours, Men sitting in their Cars ALL HOURS. It Was a Very Shameful, and Disturbing Sight. I Did Not Feel SAFE I Did Not Feel Respected by the Hotel, I Was Very Saddened to See What has happened to this place!!!! I Actually Sat in my Car one evening at 11:30PM, literally Saw 7 Vehicles pull into parking lot, they would park, Men walking straight into the HOTEL!!! I Sat for about 20 minutes was All, Seeing All the Weird Men Coming and Going It was A Very CREEPY experience, it was Very Disturbing to me. You Don't have to be a Genius to See what is going on There…It is Hard to Believe that The Hotel is Allowing this type of Illegal Activity, These prostitutes are "Running Their Business" Selfish behavior and Non-Caring. The Hotel is CREEPY Now, ALL WEIRD MEN Coming and Going…The Ramada REPUTATION has certainly Changed for the WORSE. The Prostitution at the Hotel is Bringing WEIRD, CREEPY, LOW-CLASS people, If I WANTED A HOTEL With prostitution, With NO LOCKS on the Doors, With NO SECURITY, Random Men Hiding under stairway, Walking Around inside All hours, I Could get That in Newark. This Whole Place Has Become SHAMEFUL…I Don't Recommend it for Anyone, Unless you are a "JOHN" Wanting a Good Time!!!!"[94]

- In September 2015 regarding the Ramada by Wyndham Parsippany in Wyndham's home town of Parsippany, New Jersey, a reviewer titled their review, "ALL I SAW Was Hookers, (And to Make it More Interesting, TRANS-SEXUAL MEN Who WERE PROSTITUTES)," and wrote, "…the LOCKS ARE ALL BROKEN and ANYONE CAN JUST WALK INSIDE THE BUILDING, NO SECURITY, NO LOCKS … I Think That 75% of the people Were prostitutes, and Everyone that I Saw parking and

[94] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r302891589-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html

going inside Were Not GUESTS at the hotel, I Find it very Hard to believe That there is NO MANAGEMENT Seeing this activity…DRUGS, Hookers, It was AWFUL!!!!!"[95]

- In November 2015 regarding the Ramada Hotel & Conference Center by Wyndham in Edgewood, Maryland a reviewer titled their review, "Hookers bad WiFi and smelly room."  The General Manager replied as to the other issues raised, but ignored the prostitution complaint.[96]

150.  Example reviews for Super 8 locations include:

- An August 2008 review of a Super 8 property in Arizona stated: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[97]

- A January 2010 review of a Super 8 property in Escondido, California stated: "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM, Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[98]

- A February 2010 review of a Super 8 property in Los Angeles, California stated: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made

[95] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r313180289-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html
[96] https://www.tripadvisor.com/ShowUserReviews-g41125-d89414-r325336267-Ramada_Hotel_Conference_Center_by_Wyndham_Edgewood-Edgewood_Maryland.html
[97] https://www.tripadvisor.co/Hotel_Review-g60950-d74409-Reviews-Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html
[98] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-Escondido_California.html

reservations for more than one night. He kept giving us this strange smile... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[99]

- A June 2010 review of a Super 8 property in Virginia stated: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[100]

- A July 2010 review of a Super 8 property in Texas stated: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[101]

- An October 2011 review of a Super 8 property in Tennessee stated: "Don't stay here unless you want drugs or a prostitute....or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[102]

- A February 2012 review of a Super 8 property in Florida stated: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and

[99] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html
[100] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews
[101] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-Reviews-Super_8_by_Wyndham_Austin_North_University_Area-Austin_Texas.html
[102] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8_by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html

I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE!!"[103]

- An April 2012 review of a Super 8 property in Virginia stated: "Just beware, there are "escorts" who are constantly on the lookout for fresh meet. A pimp will knock on your door asking to use your cell to call his girlfriend. From then on, she will do the work."[104]

- An April 2012 review of a Super 8 property in Texas stated: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[105]

- An October 2012 review of a Super 8 property in Florida stated: "the last time i stayed at this super 8, a hooker approached me in the parking lot and i informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[106]

- A March 2013 review of a Super 8 property in Louisiana stated: "There was a PROSTITUTE running her business from a room, with her pimp standing outside. She propositioned a co-worker as he was going to his

---

[103] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[104] https://www.expedia.com/Manassas-Hotels-Super-8-By-Wyndham-Manassas.h12141.Hotel-Reviews
[105] https://www.tripadvisor.ca/Hotel_Review-g56003-d240483-Reviews-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html
[106] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

room. Then in the middle of the night she and her clients were fighting very loudly over money and services issued!"[107]

- A March 2013 review of a Super 8 property in Ohio stated: "I've been solicited for drugs and by prostitutes here on several occassions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms."[108]

- A February 2013 review of a Super 8 property in Minnesota stated: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[109]

- An April 2013 review of a Super 8 property in Georgia stated: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[110]

- A July 2013 review of a Super 8 property in California stated: "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to turn tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children.Or anyone for that fact."[111]

---

[107] https://www.tripadvisor.ca/Hotel_Review-g40314-d120851-Reviews-FairBridge_Inn_Express_Metairie-Metairie_Louisiana.html
[108] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html
[109] https://www.tripadvisor.com/Hotel_Review-g43493-d247863-Reviews-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html
[110] https://www.tripadvisor.com/Hotel_Review-g34856-d217054-Reviews-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html
[111] https://www.tripadvisor.com/Hotel_Review-g32655-d252254-Reviews-or50-Super_8_by_Wyndham_Canoga_Park-Los_Angeles_California.html

- An August 2013 review of a Super 8 property in Ohio stated: "This hotel gives the Super 8 chain a bad reputation. The local restaurant management told us not to answer door due to prostitution issues."[112]

- An October 2013 review of a Super 8 property in Virginia stated: "We ended up wedging a pole in the door for safety reasons. After dark the place turned into, I do NOT exaggerate, a open hoer house. At lease 4 pimps were doing business with a dozen or so girls there. If not for the safety reasons it was a life experience seeing that side of society. We were surprised at a chain like Super 8 condoning this activity. . . . The big thing was the blatant open prostitution that was condoned by your chain was despicable. The car music blaring and loud laughing and yelling was just like out of a rap video. Shame on you Super 8 for condoning this kind of activity just to fill a room."[113]

151. These reviews are examples. There are many similar online reviews for Wyndham hotels, and, on information and belief, there are additional similar reviews and other customer complaints from before 2013 that are not currently available on the internet but which Wyndham Hotel Franchisors had notice of.

152. This sampling of news stories, reviews, and other public information establishes that, at the time C.M.S. was trafficked at the Subject Wyndham Hotels, the Wyndham Hotel Franchisors knew or should have known that:

   a. There was widespread and ongoing sex trafficking occurring at Wyndham properties, including without limitation each of the Subject Wyndham Hotels.

---

[112] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

[113] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html

b. Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices in Parsippany, NJ.

c. The Wyndham Hotel Franchisees and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

d. The efforts of Wyndham Hotel Franchisors, if any, to stop facilitating sex trafficking in their branded properties were not effective.

e. The Wyndham Hotel Franchisors were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

153. Despite the continually mounting evidence that sex trafficking at Wyndham properties was ongoing and growing, the Wyndham Hotel Defendants did not change course. The Wyndham Hotel Defendants chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

**B. There was widespread and obvious trafficking at the Subject Wyndham Hotels.**

154. There was widespread and ongoing sex trafficking at each of the Subject Wyndham Hotels.

155. There were open and obvious signs of the sex-trafficking activity occurring at each of the Subject Wyndham Hotels.

156. A sampling of online reviews corroborate the presence of widespread sex trafficking and other associated criminal activity at the Subject Wyndham Hotels. For example:

- A 2010 review for the Escondido Super 8 states "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM, Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[114]

- A 2013 review of the Escondido Super 8 states "This place is not safe. Heard that lot of former prisoners are dropped off there when the first get out of the pokey. That would explain what appeared to be prostitutes in the area."[115]

- A 2014 review of the San Diego Wyndham Garden states "cops here die to prostitution and drug dealers operating from this hotel."[116]

- A 2014 review of the San Diego Wyndham Garden states "The location itself was sketchy at best. We were welcomed by 2 ladies of the night when we arrived, witnessed a domestic assault, and a separate fight. Needless to say, we did not leave the room unless with a buddy."[117]

- A 2015 review of the Anaheim Ramada Inn states "worst of all we found drug paraphernalia sitting right there were my grandkids could have gotten it." [118]

- A 2017 review of the Anaheim Ramada Inn states "Everytime I stepped out of the rooms the hallways were filled the smell of marijuana. Lots of iffy people who seem like they live here. Not sure if they were prostitutes or drug addicts but there were some females wandering the parking lot for

[114] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-Escondido_California.html
[115] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-Escondido_California.html
[116] https://www.tripadvisor.com/Hotel_Review-g60750-d83575-Reviews-Wyndham_Garden_San_Diego_Near_SeaWorld-San_Diego_California.html
[117] https://www.tripadvisor.com/Hotel_Review-g60750-d83575-Reviews-Wyndham_Garden_San_Diego_Near_SeaWorld-San_Diego_California.html
[118]https://www.yelp.com/biz/ramada-by-wyndham-anaheim-convention-center-anaheim

am excessive amount of time seeming to look at cars or waiting for someone."[119]

157. Traffickers, including C.M.S.'s traffickers, repeatedly chose to use each of the Subject Wyndham Hotels for their sex-trafficking activity.

158. Upon information and belief, each of the Subject Wyndham Hotels had a population of traffickers who operated out of the hotel, who were known to hotel staff, and whose activities followed recognized patterns of trafficking that were, at all relevant times, known in the hotel industry and known to the Wyndham Hotel Franchisors and Wyndham Hotel Franchisees.

159. These traffickers, including C.M.S.'s trafficker, operated at the Subject Wyndham Hotels with little regard for concealment, due to an implicit understanding between the hotel staff and the traffickers. This understanding enabled the traffickers to operate freely without expending significant resources on concealment, as they had found venues where they could conduct their operations without disruption.

160. Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the each of the Subject Wyndham Hotels prior to C.M.S.'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in

_____

[119] https://www.yelp.com/biz/ramada-by-wyndham-anaheim-convention-center-anaheim

and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

161. At each of the Subject Wyndham Hotels, hotel staff—including management-level staff—witnessed, observed, was informed about, and otherwise learned about the obvious red flags of the trafficking activity occurring at each hotel.

162. Each of the Wyndham Hotel Franchisees knew about the sex trafficking occurring at its respective hotel through its on-the-ground role operating the hotel and through the knowledge of the hotel staff it employed. Each of the Wyndham Hotel Franchisees provided boots on the ground at its respective hotel and thus directly observed the obvious signs of sex trafficking at this hotel.

163. Each of the Wyndham Hotel Franchisees also knew or should have known about the widespread and ongoing sex trafficking at its respective hotel based on the tools that it used or had available to monitor the hotel, including guest feedback, surveillance monitoring, internal investigations, communication with law enforcement, and communication with Wyndham about security issues on the property.

164. Knowledge of the hotel staff and the Wyndham Hotel Franchisees operating at each hotel is imputed to the respective Wyndham Hotel Franchisors involved in the hotel because of the existence of an agency relationship as further described below.

165. Each of the Wyndham Hotel Franchisors knew or should have known about the sex trafficking at its respective hotel(s) based on the extensive tools that the Wyndham Hotel Franchisors used to monitor and supervise each of the Subject Wyndham Hotels, including but not limited to, because they:

    a. conducted regular inspections of the hotel properties;

    b. employed "field agents" to work with hotels on trafficking issues;

    c. publicly represented that they monitored and audited hotels to determine the status of anti-trafficking efforts;

    d. required franchisee and hotel staff to report suspected trafficking activity to Franchisors;

    e. were involved in day-to-day consulting on operational issues at the hotels;

    f. had access to surveillance systems;

    g. collected and monitored real-time guest and property data that showed patterns consistent with trafficking;

    h. participated in internal investigations;

    i. solicited and received customer feedback and complaints;[120]

[120] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("In every case, Wyndham received the guest complaint,

166. Each of the Wyndham Hotel Franchisors knew or should have known about the sex trafficking at its respective hotel(s) because, on information and belief, the Wyndham Hotel Franchisors had protocols that required hotel staff, management, and franchisees from their respective hotel(s) to report suspected criminal activity, including suspected sex trafficking, to them.

167. Upon information and belief, the "red flags" and signs of the widespread sex trafficking at each of the Subject Wyndham Hotels were so prevalent and obvious that hotel staff, management, and the Wyndham Hotel Franchisees were required to and did make numerous reports to the Wyndham Hotel Franchisors about the indicators of sex trafficking activity prior to the time that C.M.S. was trafficked at the Subject Wyndham Hotels.

168. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham hotels, and at the Subject Wyndham Hotels, the Wyndham Hotel Franchisors and Wyndham Hotel Franchisees each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at their respective hotel(s) and to make a reasonable investigation in response to signs of potential sex trafficking. If these Defendants had used ordinary prudence, they would have been aware of the widespread

monitored the response, and tried to placate disgruntled guests with Wyndham Rewards hotel points.")

and ongoing trafficking at their respective hotel(s) and that they were benefiting from such trafficking.

169. The widespread sex trafficking at each Subject Wyndham Hotels was sufficiently obvious and apparent that it was detectable to the Defendants involved in hotel operations if they exercised ordinary diligence.

**C. It was apparent and obvious that C.M.S. was being trafficked at the Subject Wyndham Hotels.**

170. During the period that C.M.S. was trafficked at the Subject Wyndham Hotels, there were obvious signs that her traffickers were engaged in sex trafficking:

a. C.M.S.'s trafficker would sometimes force her to book the room herself. The hotel staff observed her and saw that she was emotional, nervous, and scared.

b. The hotel rooms in which she was trafficked were frequently paid for with cash.

c. Hotel staff saw C.M.S. arrive and leave with her traffickers. These traffickers escorted C.M.S. around the hotel and it was apparent they were monitoring her and controlling her movements.

d. The "Do Not Disturb" door hanger was used very frequently.

e. Housekeeping staff was often prevented from entering the room for regular cleaning, towel exchange and other standard room services. C.M.S.'s traffickers would require staff to provide towels, linens and other supplies at the door without allowing them to enter.

f. C.M.S. had many johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

g. There was heavy foot traffic in and out of C.M.S.'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

h. C.M.S.'s continuous trafficking and the associated physical violence, control, threats, and manipulation her traffickers used had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the subject hotels including effects on C.M.S.'s appearance, demeanor, movements throughout the hotels, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that C.M.S. was being continually subjected to coercion, control, and exploitation.

i. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

171. Based upon information and belief, multiple employees at each of the Subject Wyndham Hotels, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

172. As such, each of the Wyndham Hotel Franchisees knew about or was willfully blind to the fact that C.M.S. was being trafficked at the defendant's respective hotel.

173. Given these obvious signs, the Wyndham Hotel Franchisors also knew or should have known about the trafficking of C.M.S. at the Subject Wyndham Hotels based on their policy or protocol that required hotel staff, management, and franchisees to report suspected criminal activity including sex trafficking.

174. The signs of C.M.S.'s trafficking were sufficiently obvious and numerous that the Wyndham Hotel Franchisees were obligated to and, upon information and

belief did, report the suspected trafficking at their respective hotels to the Wyndham Hotel Franchisors.

175. The Wyndham Franchisor Defendants also knew or should have known about C.M.S.'s trafficking based on the other methods, listed above, that they used to monitor and supervise the Subject Wyndham Hotels.

176. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham-branded hotels, and at the subject hotels, each of the Wyndham Hotel Franchisees and Wyndham Hotel Franchisors had a duty to exercise ordinary prudence to detect and respond to signs of sex trafficking at its respective hotel(s). Based on the obvious signs of C.M.S.'s sex trafficking at the Subject Wyndham Hotels, this sex trafficking was detectable to these Defendants with the exercise of ordinary prudence.

**D. The Wyndham Hotel Franchisees actively facilitated sex trafficking at the Subject Wyndham Hotels, including the trafficking of C.M.S.**

177. Each of the Wyndham Hotel Franchisees facilitated sex trafficking at its respective hotel.

178. The Wyndham Hotel Franchisees are responsible for the acts, omissions, and knowledge of all employees of their respective hotels when operating those hotels because these acts and omissions were committed in the scope and course of employment, because the Wyndham Hotel Franchisees ratified these acts and omissions, and because the Wyndham Hotel Franchisees failed to exercise reasonable

care with regard to the hiring, training, and supervision of these employees given the specific risks, known to the Wyndham Hotel Franchisees , of sex trafficking occurring at their respective hotels.

179. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at their respective hotels, the Wyndham Hotel Franchisees continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including C.M.S.

180. The Wyndham Hotel Franchisees knew or were willfully blind to the fact that C.M.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate C.M.S.'s sexual exploitation.

181. The Wyndham Hotel Franchisees also facilitated widespread trafficking at their respective hotel, including the trafficking of C.M.S., in ways including:

a. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c. choosing not to report known or suspected criminal activity including sex trafficking to the appropriate law enforcement agencies according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking

significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

e. Developing familiar relationships with traffickers who operated out of their respective hotel and accommodating specific requests that these traffickers made, such as requests regarding preferred room locations.

**E.      The Wyndham Hotel Franchisors facilitated trafficking at the Subject Wyndham Hotels, including the trafficking of C.M.S..**

182. Upon information and belief, the Wyndham Hotel Franchisors participated directly in aspects of the operation of the Wyndham Hotel Properties that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of C.M.S., as follows:

a. assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with hotels on trafficking issues;

f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for guests to report security issues to franchisor;

h. requiring franchisees to provide Wi-Fi/internet access to guests;

i. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

j. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k. requiring franchisees to use a system to monitor and track housekeeping requests;

l. setting policies for when and how housekeeping services are provided;

m. collecting and monitoring data that shows patterns of use of housekeeping services;

n. setting policies for when and how hotel staff can accept tips.

183. The Wyndham Hotel Franchisors directly participated in and retained day-to-day control over renting rooms at the Subject Wyndham Hotels by, among other things:

a. controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c. requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d. reserving rooms and accepting payments without requiring franchisee approval or involvement;

e. controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f. requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g. requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h. requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i. requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j. ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k. exercising control over the price of rooms;

l. controlling all details of the customer loyalty program that the franchisee was required to implement;

m. setting detailed policies for the check-in process, including requirements for identification and payment methods;

n. collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o. assuming sole ownership over all guest information;

p. overseeing do not rent (DNR) lists for its branded properties.

184. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Wyndham Hotels, the Wyndham Hotel Franchisors continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including C.M.S..

185. The Wyndham Hotel Franchisors knew or should have known that C.M.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate C.M.S.'s sexual exploitation.

186. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Wyndham Hotels, the Wyndham Hotel Franchisors continued participating in a venture at that hotel, with their franchisees and the hotel staff, in a way that they knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

   a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

   b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

   c. adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

   d. adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

   e. providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this

access was being used for advertising services related to their trafficking activities;

f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at the subject Wyndham branded hotels;

g. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

187. If the Wyndham Hotel Franchisors had exercised ordinary prudence when operating the Wyndham Hotel Properties and in the areas where they retained control, the Wyndham Hotel Franchisors would have prevented the Subject Wyndham Hotels from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of C.M.S.. Instead, the Wyndham Hotel Franchisors engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of C.M.S..

**F. The ventures at the Subject Wyndham Hotels.**

188. Each of the Wyndham Hotel Franchisors generated substantial income from their respective hotel(s), receiving a share of the profits from room rentals collected at the hotel(s). The fees generated by the Wyndham Hotel Franchisors were primarily based on gross room rentals; therefore, the Wyndham Hotel Franchisors' profits increased with each room rental at their respective hotel(s), including each room rented to a trafficker. Revenue generated from rooms rented at each of the Subject

Wyndham Hotels was distributed among the Wyndham Hotel Franchisors involved in that respective hotel, with each benefiting from each rental of a hotel room to a trafficker, including C.M.S.'s trafficker.

189. Each Wyndham Hotel Franchisee profited from every room rented to a trafficker or for use in trafficking at its respective hotel, both from the room fee and from fees for other hotel services.

190. In ways described more fully above, the Wyndham Hotel Franchisors and Wyndham Hotel Franchisees knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, with the population of sex traffickers operating out of their respective hotel(s), including C.M.S.'s trafficker. (hereinafter "Venture 1").

191. The Wyndham Hotel Franchisors and Wyndham Hotel Franchisees formed this continuous business relationship and implicit understanding with the traffickers at their respective hotel(s) by continuing to rent rooms to be used for trafficking (including C.M.S.'s trafficking) after they knew or should have known that the rooms were being used for unlawful trafficking.

192. This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Wyndham Hotel Franchisors and Wyndham Hotel Franchisees were generating revenue by renting the hotel rooms.

193. This implicit understanding developed because sex traffickers, including C.M.S.'s, frequently used each of the Subject Wyndham Hotels for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Hotel Franchisors and Wyndham Hotel Franchisees that created a favorable environment for sex trafficking to flourish at their respective hotel(s).

194. Both the Wyndham Hotel Franchisors and Wyndham Hotel Franchisees participated in this venture by acting jointly to rent rooms to traffickers and to operate their respective hotel(s) in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, the Wyndham Hotel Franchisees provided "boots on the ground" at their respective hotels, and the Wyndham Hotel Franchisors played a primary role in renting rooms at each of the Subject Wyndham Hotels and retained control over and were directly involved in aspects of hotel operations related to sex trafficking.

195. The Wyndham Hotel Franchisors and Wyndham Hotel Franchisees participated in the venture by continued renting rooms to traffickers, including C.M.S.'s, after they knew or should have known that victims like Jane Doe C.M.S. were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select their respective hotel(s) as a venue for their illegal activities.

196. Wyndham Hotel Franchisors and Wyndham Hotel Franchisees did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

- The population of traffickers, including C.M.S.'s, were familiar to the staff at each of the Subject Wyndham Hotels;

- These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at each of the Subject Wyndham Hotels but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

- Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

- Defendants provided additional services to traffickers (including C.M.S.'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

- The staff at each of the Subject Wyndham Hotels accommodated the traffickers' requests for preferred locations, which facilitated their illegal activities.

197. The criminal traffickers operating at the Subject Wyndham Hotels as part of Venture 1 violated 18 U.S.C. §1591 as to victims, including C.M.S.

198. If Wyndham Hotel Franchisors and Wyndham Hotel Franchisees had not continued participating in a venture that they knew or should have known engaged in

violations of the TVPRA, they would not have received a benefit from C.M.S.'s trafficking at the Subject Wyndham Hotels.

199. In ways described more fully above, the Wyndham Hotel Franchisors and Wyndham Hotel Franchisee also knowingly received a financial benefit from participating in a commercial hotel-operating venture at their respective hotel(s) (hereinafter "Venture 2").

200. Each of the Wyndham Hotel Franchisors had a longstanding relationship with its respective franchisee(s) pursuant to which they jointly participated in operation of their respective hotel with a shared goal of maximizing revenue, including gross room revenue.

201. The Wyndham Hotel Franchisors and Wyndham Hotel Franchisee, through their roles in operations at their respective hotel(s) as described above, facilitated widespread sex trafficking at their respective hotel(s) by continuing to operate the hotel(s) in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site.

202. Venture 2 was engaged in violations of the TVRPA through the widespread sex trafficking at each of the Subject Wyndham Hotels, which resulted in C.M.S. and other victims being harbored, maintained, and provided in the rooms of the Subject Wyndham Hotels. Venture 2 also engaged in a violation of the TVPRA through the actions of the Wyndham Hotel Franchisees who—providing boots on the ground at

their respective hotel(s) where the trafficking occurred—violated the TVPRA as perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a)(2).

203. Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Hotel Franchisors and Wyndham Hotel Franchisees participated in the venture by continuing to operate their respective hotels in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of C.M.S. The Wyndham Hotel Franchisors continued providing their respective hotels with operational support, use of trademarks, marketing services, and other resources to operate the hotel(s) in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

**G. The Wyndham Hotel Franchisors are vicariously liable for the TVPRA violations of their respective franchisees.**

204. The Wyndham Hotel Franchisors are vicariously liable for the acts, omissions, and knowledge of their respective franchisees and staff at their respective hotels, which are their actual agents or subagents.

205. The Wyndham Hotel Franchisors subjected their respective franchisees to detailed standards and requirements regarding the operation of the Subject Wyndham Hotels through the franchising agreements, through detailed written policies and

manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Hotel Franchisors.

206. The Wyndham Hotel Franchisors obscure the full extent of control they exercise over their respective franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Hotel Franchisors imposed on the franchisees:

a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used;

b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions;

c. dictated the specific manner in which franchisees and hotel staff must carry out most day-to-day functions; and

d. significantly exceeded what was necessary to protect their registered trademarks.

207. In addition to the ways described above, upon information and belief, the Wyndham Hotel Franchisors exercised and reserved the right to exercise systemic and pervasive control over their respective franchisee(s)'s day-to-day operation of their respective hotels, including the following ways:

a. Wyndham Hotel Franchisors required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that

go significantly beyond what would be necessary for Wyndham Hotel Franchisors to protect their registered trademarks;

b. Wyndham Hotel Franchisors maintained a team of regionally based trainers to provide training at branded hotels. Wyndham Hotel Franchisors provided training for hotel management and select hotel staff on-site and at locations selected by Wyndham Hotel Franchisors;

c. Wyndham Hotel Franchisors provided hotel staff with training they created through an online learning platform, Wyndham University, they controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d. Wyndham Hotel Franchisors controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. Wyndham Hotel Franchisors retained sole discretion to determine whether all training had been completed satisfactorily;

f. Wyndham Hotel Franchisors maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g. Wyndham Hotel Franchisors required franchisees to participate in mandatory centralized services for day-to-day operation of the hotels;

h. For certain products and services that franchisees were required to purchase to operate the property, Wyndham Hotel Franchisors designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

i. Wyndham Hotel Franchisors required franchisees to use their revenue management system, through which they dictated pricing and strategies to maximize revenue, and which gave them direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

j. Wyndham Hotel Franchisors set required staffing levels for the subject properties;

k. Wyndham Hotel Franchisors established detailed job descriptions for all positions in their branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l. Wyndham Hotel Franchisors set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m. Wyndham Hotel Franchisors provided benefits for employees of franchised hotels;

n. Wyndham Hotel Franchisors controlled channels for guests to report complaints or provide feedback regarding the subject properties and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham Hotel Franchisors retained the right to provide refunds or other compensation to guests and to require Franchisee Defendants to pay associated costs;

o. Wyndham Hotel Franchisors generated reports and analysis of guest complaints and online reviews for the subject properties;

p. Wyndham Hotel Franchisors set detailed requirements for insurance that Franchisee Defendants must purchase;

q. Wyndham Hotel Franchisors exercised or retained control over the franchisee's day-to-day accounting and banking practices;

r. Wyndham Hotel Franchisors regularly audited the books and records of their respective franchisees;

s. Wyndham Hotel Franchisors conducted frequent and unscheduled inspections of the subject properties;

t. Wyndham Hotel Franchisors retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of the franchisors' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject properties;

u. Wyndham Hotel Franchisors controlled all marketing for the subject properties, directly provided marketing services, and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by Wyndham Hotel Franchisors;

v. Wyndham Hotel Franchisors exercised or retained control over all aspects of building and facility design;

w. Wyndham Hotel Franchisors imposed detailed recordkeeping and reporting requirements on franchisees regarding virtually all aspects of hotel operations;

x. Wyndham Hotel Franchisors supervised and controlled day-to-day operations of the subject properties through detailed information and extensive reports that they obtained through the property management system and other software systems they required franchisees to use;

y. Wyndham Hotel Franchisors required the franchisee and hotel staff to implement a data system that gives Wyndham Hotel Franchisors real-time information that they can monitor on a day-to-day basis; and

z. Wyndham Hotel Franchisors retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

208. Upon information and belief, Wyndham Hotel Franchisors had the right to and did enforce their control over Wyndham Hotel Franchisors through various methods, including:

a. the right to conduct detailed inspections of the subject properties;

b. monitoring or auditing the Franchisees for compliance with policies and expectations;

c. directing Franchisees to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. the right to impose fines or penalties;

g. the right to impose additional conditions on franchisee or to restrict or limit their right to provide goods and services; and

h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

### H. The Wyndham Hotel Franchisors are jointly responsible for the Subject Wyndham Hotels.

209. Wyndham adopted a centralized approach to operation of all Wyndham hotels, regardless of the specific brand. Thus, while it operated some sub-brands under the Wyndham umbrella, such as Ramada Inn and Super 8, through separate affiliated entities, Wyndham directly participated in operation and control of each of these hotels, profited from revenue at each of these hotels, and exercised control over the affiliated entities involved in the operation of each of these hotels.

210. Upon information and belief, all the Wyndham Franchisor Defendants are subject to common control and ownership and share officers, finances, resources, and information regarding operation of the Subject Wyndham Hotels.

211. Each of the Wyndham Hotel Franchisors participated in joint venture(s) involving a common enterprise, profit-sharing, a community of interests, and joint rights of control and management as follows:

- The Ramada Inn Franchisors participated in a joint venture operating the Anaheim Ramada Inn, such that—in addition to having individually

violated the TVPRA—they are **also** vicariously liable for the TVPRA violations of the other Ramada Inn Franchisors.

- The Super 8 Franchisors participated in a joint venture operating the Escondido Super 8, such that—in addition to having individually violated the TVPRA—they are **also** vicariously liable for the TVPRA violations of the other Super 8 Franchisors.

- The Wyndham Garden Franchisors participated in a joint venture operating the San Diego Wyndham Garden, such that—in addition to having individually violated the TVPRA—they are **also** vicariously liable for the TVPRA violations of the other Wyndham Garden Franchisors.

## IV. C.M.S.'S SEX TRAFFICKING AT THE TEMECULA LA QUINTA
### A. La Quinta Franchisors knew that sex trafficking was a widespread problem at La Quinta Hotels.

212. La Quinta Franchisors had known, since well before C.M.S.'s trafficking, that sex trafficking was ongoing and widespread at La Quinta branded properties, including the Temecula La Quinta.

213. Upon information and belief, La Quinta Franchisors monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories and online reviews confirming the widespread presence of sex trafficking, prostitution, and related criminal activity at La Quinta branded hotels, include:

- In 2009, an arrest was made at a La Quinta Inn in Cambridge where a man was forcing a woman into prostitution by threatening her with bodily harm.[121]

---

[121] https://www.metrowestdailynews.com/story/bulletin-tab/2009/07/01/former-state-rep-s-son/65129427007/

- In February 2013, police made arrests for a sex slavery ring running out of a La Quinta Inn near San Francisco International Airport.[122]

- In August 2013, a man was arrested and charged with trafficking offenses after dropping a 15-year-old girl at a La Quinta Inn in San Francisco.[123]

- In 2014, Raleigh police responded to the La Quinta Inn where a victim said she was forced into the commercial sex trade and discovered a family-run, multi-state sex trafficking ring that was operating at hotels.[124]

- In 2014, a 16-year-old trafficking victim was found by law enforcement with a 61-year-old man inside the La Quinta Inn in Tallahassee.[125]

- In 2013, a La Quinta Inn San Diego was sued by City Attorney's Office for its history of illegal activity. The hotel was "ordered to increase security after complaints of prostitution and nuisance activity. La Quinta Hotel…must now install more security cameras and signs to deter criminal activity. The hotel agreed to do this as part of a settlement with the San Diego City Attorney's office. The San Diego Police Department discovered prostitution at the hotel during several undercover sting operations. Court documents show multiple undercover operations where investigators said they arranged to meet at the hotel with prostitutes through websites."[126]

---

[122] https://www.huffpost.com/entry/south-san-francisco-sex-slavery_n_2734350
[123] https://www.sfgate.com/crime/article/How-girls-fall-into-clutches-of-pimps-4705407.php
[124] https://www.wral.com/larceny-call-unveils-family-run-sex-trafficking-ring/14031981/
[125] https://www.tallahassee.com/story/news/local/2014/06/02/sex-trafficking-arrests-tallahassee/9856065/
[126] https://www.nbcsandiego.com/news/local/la-quinta-hotel-rancho-penasquitos-san-diego-paseo-montril/2050904/

214. Sex trafficking at La Quinta branded properties was not isolated to one hotel or geographic area and became a nationwide problem due to decisions made by top-tier managers and employees of La Quinta Franchisors.

215. La Quinta Franchisors knew the sex trafficking crisis was prevalent in the hotel industry generally and specifically at its branded hotels, including the La Quinta, where Plaintiff was trafficked.

**B.      There was widespread and obvious trafficking at the Temecula La Quinta.**

216. There was widespread and ongoing sex trafficking at the Temecula La Quinta.

217. There were open and obvious signs of the sex-trafficking activity occurring at the Temecula La Quinta.

218. Traffickers, including C.M.S.'s traffickers, repeatedly chose to use the Temecula La Quinta for their sex-trafficking activity.

219. Upon information and belief, the Temecula La Quinta had a population of traffickers who operated out of the hotel, who were known to hotel staff, and whose activities followed recognized patterns of trafficking that were, at all relevant times, known in the hotel industry and known to the La Quinta Franchisors and La Quinta Franchisees.

220. These traffickers, including C.M.S.'s trafficker, operated at the Temecula La Quinta with little regard for concealment, due to an implicit understanding between

the hotel staff and the traffickers. This understanding enabled the traffickers to operate freely without expending significant resources on concealment, as they had found venues where they could conduct their operations without disruption.

221. Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the each of the Temecula La Quinta prior to C.M.S.'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

222. At the Temecula La Quinta, hotel staff—including management-level staff—witnessed, observed, was informed about, and otherwise learned about the obvious red flags of the trafficking activity occurring at each hotel.

223. The La Quinta Franchisees knew about the sex trafficking occurring at the Temecula La Quinta through its on-the-ground role operating the hotel and through the

knowledge of the hotel staff it employed. The La Quinta Franchisees directly observed the obvious signs of sex trafficking at this hotel.

224. The La Quinta Franchisees also knew or should have known about the widespread and ongoing sex trafficking at the Temecula La Quinta based on the tools that they used or had available to monitor the Temecula La Quinta, including guest feedback, surveillance monitoring, internal investigations, communication with law enforcement, and communication with La Quinta Franchisors about security issues on the property.

225. Knowledge of the hotel staff and the La Quinta Franchisees operating at each hotel is imputed to La Quinta Franchisors because of the existence of an agency relationship as further described below.

226. La Quinta Franchisors knew or should have known about the sex trafficking at the Temecula La Quinta based on the extensive tools that it used to monitor and supervise this hotel, including but not limited to:

a. obligation of hotel staff and franchisees to report suspected criminal activity, including sex trafficking;

b. regular monitoring of online reviews;

c. collection and monitoring of customer surveys and complaints;

d. requirement that franchisees submit regular and detailed reports about day-to-day hotel operations;

e. collection and monitoring of data about guests, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f. supervision and control over day-to-day operations of the hotel through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisees to use and through which franchisees were obligated to allow La Quinta Franchisors to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g. regular inspections of the hotel property;

h. employment of field agents to work with hotels on security issues, including trafficking issues;

i. access to surveillance and security systems;

j. information provided by law enforcement; and

k. Other sources of information uniquely available to La Quinta Franchisors.

227. La Quinta Franchisors knew or should have known about the sex trafficking at the Temecula La Quinta because, on information and belief, La Quinta Franchisors had protocols that required hotel staff, management, and franchisees to report suspected criminal activity, including suspected sex trafficking, to La Quinta Franchisors.

228. Upon information and belief, the "red flags" and signs of the widespread sex trafficking at the Temecula La Quinta were so prevalent and obvious that hotel staff, management, and the La Quinta Franchisees were required to and did make

numerous reports to La Quinta Franchisors about the indicators of sex trafficking activity prior to the time that C.M.S. was trafficked at the Temecula La Quinta.

229. Based on their knowledge of the problem of sex trafficking in the hotel industry, at La Quinta hotels, and at the Temecula La Quinta, La Quinta Franchisors and La Quinta Franchisees each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the hotel and to make a reasonable investigation in response to signs of potential sex trafficking. If these Defendants had used ordinary prudence, they would have been aware of the widespread and ongoing trafficking at the hotel and that they were benefiting from such trafficking.

230. The widespread sex trafficking at each Temecula La Quinta was sufficiently obvious and apparent that it was detectable to the Defendants involved in hotel operations if they exercised ordinary diligence.

**C.   There were obvious signs of Jane Doe (C.M.S.)'s trafficking at the Temecula La Quinta.**

231. During the period that C.M.S. was trafficked at the Temecula La Quinta, there were obvious signs that her traffickers were engaged in sex trafficking:

   a. C.M.S.'s trafficker would sometimes force her to book the room herself. The hotel staff observed her and saw that she was emotional, nervous, and scared.

   b. The hotel rooms in which she was trafficked were frequently paid for with cash.

c. Hotel staff saw C.M.S. arrive and leave with her traffickers. These traffickers escorted C.M.S. around the hotel and it was apparent they were monitoring her and controlling her movements.

d. The "Do Not Disturb" door hanger was used very frequently.

e. Housekeeping staff was often prevented from entering the room for regular cleaning, towel exchange and other standard room services. C.M.S.'s traffickers would require staff to provide towels, linens and other supplies at the door without allowing them to enter.

f. C.M.S. had many johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

g. There was heavy foot traffic in and out of C.M.S.'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

h. C.M.S.'s continuous trafficking and the associated physical violence, control, threats, and manipulation her traffickers used had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the subject hotels including effects on C.M.S.'s appearance, demeanor, movements throughout the hotels, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that C.M.S. was being continually subjected to coercion, control, and exploitation

i. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well-known "red flags" for trafficking in a hotel.

232. Based upon information and belief, multiple employees of the Temecula La Quinta, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

233. As such, La Quinta Franchisees knew about or were willfully blind to the fact that C.M.S. was being trafficked at the Temecula La Quinta.

234. Given these obvious signs, the La Quinta Franchisors also knew or should have known about the trafficking of C.M.S. at the Temecula La Quinta based on its policy or protocol that required hotel staff, management, and franchisees to report suspected criminal activity including sex trafficking.

235. The signs of C.M.S.'s trafficking were sufficiently obvious and numerous that La Quinta Franchisees were obligated to and, upon information and belief did, report the suspected trafficking to La Quinta Franchisors.

236. La Quinta Franchisors also knew or should have known about C.M.S.'s trafficking based on the other methods, listed above, that they used to monitor and supervise the Temecula La Quinta.

237. Based on their knowledge of the problem of sex trafficking in the hotel industry, at La Quinta-branded hotels, and at the Temecula La Quinta, La Quinta Franchisors s and La Quinta Franchisees each had a duty to exercise ordinary prudence to detect and respond to signs of sex trafficking at this hotel. Based on the obvious signs of C.M.S.'s sex trafficking at the Temecula La Quinta, this sex trafficking was detectable to these Defendants with the exercise of ordinary prudence.

**D. La Quinta Franchisees facilitated the trafficking of C.M.S. at the Temecula La Quinta.**

238. La Quinta Franchisees are responsible for the acts, omissions, and knowledge of all employees of the Temecula La Quinta when operating the hotel because these acts and omissions were committed in the scope and course of employment, because La Quinta Franchisees ratified these acts and omissions, and because -La Quinta Franchisees failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to La Quinta Franchisees, of sex trafficking occurring at Homewood Suites properties including the Temecula La Quinta.

239. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Temecula La Quinta, La Quinta Franchisees continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including C.M.S.

240. La Quinta Franchisees knew or were willfully blind to the fact that C.M.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate C.M.S.'s sexual exploitation.

241. La Quinta Franchisees also facilitated widespread trafficking at the Homewood Suites property, including the trafficking of C.M.S., in ways including:

a.     allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c. choosing not to report known or suspected criminal activity including sex trafficking to the appropriate law enforcement agencies according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff; and

e. accommodating specific requests of the traffickers.

**E.     La Quinta Franchisors facilitated trafficking at the Temecula La Quinta, including the trafficking of C.M.S.**

242.   Upon information and belief, La Quinta Franchisors participated directly in aspects of the operation of the Temecula La Quinta that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of C.M.S., as follows:

a. assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with hotels on trafficking issues;

f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for guests to report security issues to franchisor;

h. requiring franchisees to provide Wi-Fi/internet access to guests;

i. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

j. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k. requiring franchisees to use a system to monitor and track housekeeping requests;

l. setting policies for when and how housekeeping services are provided;

m. collecting and monitoring data that shows patterns of use of housekeeping services;

n. setting policies for when and how hotel staff can accept tips.

243. Upon information and belief, La Quinta Franchisors directly participated in and retained day-to-day control over renting rooms at the Temecula La Quinta by, among other things:

a. controlling all details of the guest reservation, check-in, and payment processes through both its management and control over all systems used for those processes and its adoption of detailed and specific policies

governing the means and methods hotel staff used for each of these processes;

b. directly making reservations for rooms at the Temecula La Quinta and accepting payment for those rooms through a central reservation system that it controlled and operated, and which franchisee was required to use;

c. reserving rooms and accepting payments without requiring franchisee approval or involvement;

d. controlling extension of existing room reservations and requiring guests to contact them directly to extend reservations;

e. controlling the payment methods that would be accepted and had access to information about which guests used which payment methods through its backend access to the reservation and payment systems they required their franchisee to use;

f. controlling policies and protocols for guest identity verification at the time of check in;

g. setting room rates, required discounts, mandatory fees, and rewards programs;

h. restricting the ability of hotel staff to refuse or cancel a reservation;

i. establishing detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the hotel until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in;

j. requiring franchisee to use their property management system, which was owned, maintained, controlled, and operated by La Quinta Franchisors, for virtually all aspects of hotel operations regarding room reservations and payment;

k. assuming sole ownership over all guest information;

l. overseeing do not rent (DNR) lists for its branded properties.

244. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Temecula La Quinta, the La Quinta Franchisors

continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including C.M.S.

245. The La Quinta Franchisors knew or should have known that C.M.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate C.M.S.'s sexual exploitation.

246. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Temecula La Quinta, the La Quinta Franchisors continued participating in a venture at that hotel, with their franchisees and the hotel staff, in a way that they knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

    a. La Quinta Franchisors adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and front-line hotel staff regarding issues related to human trafficking.

    b. La Quinta Franchisors implicitly condoned and endorsed its franchisee's repeated decisions not to report trafficking to law enforcement or respond to trafficking appropriately.

    c. La Quinta Franchisors ignored policies that they had purportedly enacted and implemented.

    d. La Quinta Franchisors continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking.

    e. Despite having specific knowledge of policies that would significantly reduce sex trafficking at the hotel, La Quinta Franchisors declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at the Temecula La Quinta.

f. La Quinta Franchisors attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

g. La Quinta Franchisors allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

h. La Quinta Franchisors adopted and required their franchisee to adopt check in procedures that failed to ensure all hotel guests were appropriately identified and, instead, allowed guests to use the hotel with minimal risk of traceability.

i. La Quinta Franchisors continued to allow the hotel to profit by using brand trademarks despite actual or constructive knowledge of ongoing sex trafficking in that hotel. Lending the perceived legitimacy of the brand d affirmatively facilitated sex trafficking by providing a venue where sex trafficking could occur with minimal risk of detection by law enforcement or traceability.

j. La Quinta Franchisors provided traffickers with access to internet services that it knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

247. If the La Quinta Franchisors had exercised ordinary prudence when operating the Temecula La Quinta and in the areas where it retained control, La Quinta Franchisors would have prevented the hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of C.M.S. Instead, the La Quinta Franchisors engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of C.M.S.

**F.    The ventures at the Temecula La Quinta.**

248. La Quinta Franchisors generated substantial income from the Temecula La Quinta, receiving a share of the profits from room rentals collected at the hotel. The fees generated by La Quinta Franchisors were primarily based on gross room rentals;

therefore, La Quinta Franchisors' profits increased with each room rental at this hotel, including each room rented to a trafficker.

249. La Quinta Franchisees profited from every room rented to a trafficker or for use in trafficking at this hotel, both from the room fee and from fees for other hotel services.

250. In ways described more fully above, La Quinta Franchisors and La Quinta Franchisees knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, with the population of sex traffickers operating out of the Temecula La Quinta, including C.M.S.'s trafficker. (hereinafter "Venture 1").

251. La Quinta Franchisors and La Quinta Franchisees formed this continuous business relationship and implicit understanding with the traffickers at the Temecula La Quinta by continuing to rent rooms to be used for trafficking (including C.M.S.'s trafficking) after they knew or should have known that the rooms were being used for unlawful trafficking.

252. This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and La Quinta Franchisors and La Quinta Franchisees were generating revenue by renting the hotel rooms.

253. This implicit understanding developed because sex traffickers, including C.M.S.'s, frequently used the Temecula La Quinta for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of La Quinta Franchisors and La Quinta Franchisees that created a favorable environment for sex trafficking to flourish at their respective hotel(s).

254. Both La Quinta Franchisors and La Quinta Franchisees participated in this venture by acting jointly to rent rooms to traffickers and to operate their respective hotel(s) in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, the La Quinta Franchisees provided "boots on the ground" at their respective hotels, and La Quinta Franchisors played a primary role in renting rooms at the Temecula La Quinta and retained control over and were directly involved in aspects of hotel operations related to sex trafficking.

255. La Quinta Franchisors and La Quinta Franchisees participated in the venture by continued renting rooms to traffickers, including C.M.S.'s, after they knew or should have known that victims like Jane Doe C.M.S. were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the hotel as a venue for their illegal activities.

256. La Quinta Franchisors and La Quinta Franchisees did not only provide these traffickers with a physical space (harboring) where they could imprison victims

and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

- The population of traffickers, including C.M.S.'s, were familiar to the staff at the Temecula La Quinta;

- These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Temecula La Quinta but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

- Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

- Defendants provided additional services to traffickers (including C.M.S.'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

- The staff at the Temecula La Quinta accommodated the traffickers' requests for preferred locations, which facilitated their illegal activities.

257. The criminal traffickers operating at the Temecula La Quinta as part of Venture 1 violated 18 U.S.C. §1591 as to victims, including C.M.S..

258. If La Quinta Franchisors and La Quinta Franchisees had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from C.M.S.'s trafficking at the Temecula La Quinta.

259. In ways described more fully above, La Quinta Franchisors and La Quinta Franchisees also knowingly received a financial benefit from participating in a commercial hotel-operating venture at their respective hotel(s) (hereinafter "Venture 2").

260. La Quinta Franchisors had a longstanding relationship with its respective franchisee(s) pursuant to which they jointly participated in operation of the Temecula La Quinta with a shared goal of maximizing revenue, including gross room revenue.

261. La Quinta Franchisors and La Quinta Franchisees, through their roles in operations at Temecula La Quinta, as described above, facilitated widespread sex trafficking at the Temecula La Quinta by continuing to operate the hotel in a way that they knew or should have known, resulting in them benefiting from significant sex trafficking occurring on site.

262. Venture 2 was engaged in violations of the TVRPA through the widespread sex trafficking at the Temecula La Quinta, which resulted in C.M.S. and other victims being harbored, maintained, and provided in the rooms of the Temecula La Quinta. Venture 2 also engaged in a violation of the TVPRA through the actions of the La Quinta Franchisees who—providing boots on the ground at the Temecula La Quinta where the trafficking occurred—violated the TVPRA as perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

263. Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), La Quinta Franchisors and La Quinta Franchisees participated in the venture by continuing to operate their respective hotels in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of C.M.S. La Quinta Franchisors continued providing their respective hotels with operational support, use of trademarks, marketing services, and other resources to operate the hotel(s) in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

**G.      La Quinta Franchisors is vicariously liable for the TVPRA violations of La Quinta Franchisees.**

264. La Quinta Franchisors is vicariously liable for the acts, omissions, and knowledge of La Quinta Franchisees and staff at the Temecula La Quinta, which are the actual agents or subagents of La Quinta Franchisors.

265. La Quinta Franchisors subjected La Quinta Franchisees to detailed standards and requirements regarding the operation of the Temecula La Quinta through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by La Quinta Franchisors.

266. La Quinta Franchisors obscure the full extent of control it exercises over La Quinta Franchisees by treating its manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon

information and belief, the control that the La Quinta Franchisors imposed on La Quinta Franchisees:

e. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools La Quinta Franchisees used;

f. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions;

g. dictated the specific manner in which franchisees and hotel staff must carry out most day-to-day functions; and

h. significantly exceeded what was necessary to protect their registered trademarks.

267. In addition to the ways described above, upon information and belief, the La Quinta Franchisors exercised and reserved the right to exercise systemic and pervasive control over their respective franchisee(s)'s day-to-day operation of their respective hotels, including the following ways:

a. requiring franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for protection of registered trademarks;

b. maintaining a team of regionally based trainers to provide training at branded hotels.

c. providing hotels staff with training it created through an online learning platform, they controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d. controlling training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. retaining sole discretion to determine whether all training had been completed satisfactorily;

f. requiring franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

g. for certain products and services that franchisee was required to purchase to operate the hotel, designating approved vendors and prohibiting franchisee from purchasing goods and services from anyone other than an approved vendor;

h. requiring franchisees to use its revenue management system, through which they dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

i. setting required staffing levels;

j. establishing detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

k. controlling channels for guests to report complaints or provide feedback directly participating in the response and/or supervising franchisee's response to customer complaints or other feedback.

l. generating reports and analysis of guest complaints and online reviews;

m. setting detailed requirements for insurance that La Quinta Franchisees must purchase;

n. exercising or retaining control over La Quinta Franchisees' day-to-day accounting and banking practices;

o. regularly auditing the books and records of La Quinta Franchisees;

PLAINTIFF'S SECOND AMENDED COMPLAINT 100

p. controlling all marketing for La Quinta Franchisees, directly providing marketing services, and prohibiting La Quinta Franchisees from maintaining any online presence unless specifically reviewed and approved;

q. exercising or retaining control over all aspects of building and facility design;

r. supervising and controlling day-to-day operations through detailed information and extensive reports that it obtained through the property management system and other software systems it required La Quinta Franchisees to use;

s. requiring La Quinta Franchisees and hotel staff to implement a data system that gives the LQ Defendants real-time information that they can monitor on a day-to-day basis; and

t. retaining the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

**H.    The La Quinta Franchisors are jointly responsible for operation of the Temecula La Quinta.**

268.    All the La Quinta Franchisors were participants in a joint venture operating the Temecula La Quinta, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

269.    Upon information and belief, the La Quinta Franchisors shared personnel, office space, and officers. The LQ Defendants engaged in agreements without consideration. The La Quinta Franchisors failed to observe corporate formalities. The

La Quinta Franchisors acted as an integrated enterprise and/or as alter-egos of one another.

270. The La Quinta Franchisors are vicariously liable for the acts and omissions of the other La Quinta Franchisors with regard to the operation of the Temecula La Quinta.

## V. C.M.S.'S SEX TRAFFICKING AT THE HILTON HOTEL

### I. Hilton-Homewood Suites Franchisor knew that sex trafficking was a widespread problem at Hilton Hotels.

271. Hilton-Homewood Suites Franchisor has known, since well before C.M.S.'s trafficking, that sex trafficking was ongoing and widespread at Hilton branded properties, including the San Jose Homewood Suites.

272. Upon information and belief, Hilton-Homewood Suites Franchisor monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories and online reviews confirming the widespread presence of sex trafficking, prostitution, and related criminal activity at Hilton-branded hotels, include:

- A 2009 review of a Hilton-branded property in New York noted that the hotel bar was used by prostitutes to pick up guests, that this could be spotted from a mile away, and that the hotel staff allowed it.[127]

- A 2010 review of a Hilton property in New York stated, "It's true what other reviewers have commented on regarding prostitutes/escorts in the hotel bars. If you are paying attention you will be able to pick them out.

[127] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html

we sat right next to a table one night when this was going on. the staff didn't seem to care. It's too bad because there were families in the bar also."[128]

- In 2011, a man was convicted of sex trafficking a minor at a Hilton-branded hotel in Minnesota.[129]

- In 2011, a prostitute was raped when two men forced their way into her room at a Hilton-branded property in New Hampshire.

- In 2012, a man was charged with sex trafficking at another Hilton-Homewood Suites Franchisor-branded hotel in Minnesota.[130]

- In 2012, a couple was charged with sex trafficking an 18-year-old girl with Autism Spectrum Disorder at a Hilton-branded property.[131]

- In 2012, a man was charged with forced labor and sex trafficking following a sting at a Hilton-branded hotel in California.[132]

- In 2012, arrests were made after police conducted a prostitution sting operation at a Hilton-branded property in Memphis.[133]

- A 2013 review of a Hilton property in New York stated, "But the prostitution going on in the lobby bar is so obvious The Waldorf must endorse it. Shame on you!"[134]

---

[128] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html
[129] https://www.startribune.com/28-years-for-man-who-used-girl-for-prostitution/118163089/
[130] https://www.startribune.com/fridley-man-st-paul-woman-accused-of-prostituting-iowa-teen/138615249/
[131] https://www.twincities.com/2012/02/01/couple-charged-with-prostituting-runaway-iowa-girl-with-asperger-syndrome/
[132] https://www.nbclosangeles.com/news/local/long-beach-roshaun-kevin-nakia-porter-accused-human-trafficking-orange-county-pimp/1951757/
[133] https://www.actionnews5.com/story/20142585/suspected-prostitutes-busted-at-beale-area-hotel/
[134] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html

- In 2013, a man was charged with forcing a woman into prostitution at a Hilton property in Florida.[135]
- In 2014, a sex trafficking victim was found murdered at a Hilton property in Oregon.[136]

273. Sex trafficking at Hilton branded properties was not isolated to one hotel or geographic area and became a nationwide problem due to decisions made by top-tier managers and employees of Hilton-Homewood Suites Franchisor.

274. Hilton-Homewood Suites Franchisor knew the sex trafficking crisis was prevalent in the hotel industry generally and specifically at its branded hotels, including the Homewood Suites, where Plaintiff was trafficked.

275. Upon information and belief, at all relevant times, Hilton-Homewood Suites Franchisor, acting directly and through affiliates, adopted centralized policies that controlled the Hilton-Homewood Suites Franchisee Defendants and Hilton-branded properties, including the San Jose Homewood Suites. This extends to the hotels' approach to human trafficking.

276. Sex trafficking was prevalent at Hilton-branded properties, including Homewood Suites properties, both on a national scale and in the State of California.

---

[135] https://www.nbcmiami.com/news/local/broward-judge-sets-30000-bond-for-man-charged-with-human-trafficking/1923493/

[136] https://www.krem.com/article/news/nation/sex-trafficking-victim-found-slain-in-portland-hotel/293-157195643

277. Hilton-Homewood Suites Franchisor was aware of the issue of sex trafficking in Hilton-branded properties, including through the following public statements:

- As early as 2010, Chinese police found a brothel operating inside a Hilton-branded hotel, which prompted Hilton Worldwide officials to publicly claim to be working on a code of conduct to prevent child sex trafficking at its branded properties.[137]

- Hilton-Homewood Suites Franchisor, on behalf of its brands including Homewood Suites, joined the ECPAT-USA Code in 2011, acknowledging its duties to prevent and protect children from trafficking after over a year of advocacy directed at Hilton branded properties by anti-trafficking advocates.[138]

- Speaking on behalf of its brand, Hilton-Homewood Suites Franchisor stated in 2013: "Sex trafficking and sexual tourism is a large and growing problem worldwide, and Hilton Worldwide must never allow any of its properties, products, or services to be used in a nan manner that supports or enables any form of abuse and exploitation."[139]

- In 2015 Hilton-Homewood Suites Franchisor conducted a global human rights assessment for all its branded properties, which identified the following risk: hotels may be used by criminals to traffic victims for exploitation.[140]

[137] https://www.nasdaq.com/articles/hilton-working-abolsish-child-sex-trafficking-2010-11-03
[138] https:stopchildlabororg/Hilton-signs-code-of-conduct-to-prevent-child-prostitution/
[139] https://thecode.my.salesforce-site.com/apex/publicPdf?id=0019000000GxgQIAAAZ&year=2013
[140] https://esg.hilton.com/wp-content/uploads/sites/3/2002/08/Hilton-FY-2021-Modern -Slavery-Act-Statement-1.pdf

**J.      There was widespread and obvious trafficking at the San Jose Homewood Suites.**

278.   There was widespread and ongoing sex trafficking at the San Jose Homewood Suites.

279.   There were open and obvious signs of the sex-trafficking activity occurring at the San Jose Homewood Suites.

280.   Traffickers, including C.M.S.'s traffickers, repeatedly chose to use the San Jose Homewood Suites for their sex-trafficking activity.

281.   Upon information and belief, the San Jose Homewood Suites had a population of traffickers who operated out of the hotel, who were known to hotel staff, and whose activities followed recognized patterns of trafficking that were, at all relevant times, known in the hotel industry and known to the Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee.

282.   These traffickers, including C.M.S.'s trafficker, operated at the San Jose Homewood Suites with little regard for concealment, due to an implicit understanding between the hotel staff and the traffickers. This understanding enabled the traffickers to operate freely without expending significant resources on concealment, as they had found venues where they could conduct their operations without disruption.

283.   Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the each of the San Jose Homewood Suites prior to C.M.S.'s trafficking who exhibited "red flags"

of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

284. At the San Jose Homewood Suites, hotel staff—including management-level staff—witnessed, observed, was informed about, and otherwise learned about the obvious red flags of the trafficking activity occurring at each hotel.

285. The Homewood Suites Franchisee knew about the sex trafficking occurring at the San Jose Homewood Suites through its on-the-ground role operating the hotel and through the knowledge of the hotel staff it employed. The Homewood Suites Franchisee directly observed the obvious signs of sex trafficking at this hotel.

286. The Homewood Suites Franchisee also knew or should have known about the widespread and ongoing sex trafficking at the San Jose Homewood Suites based on the tools that they used or had available to monitor the San Jose Homewood Suites, including guest feedback, surveillance monitoring, internal investigations,

communication with law enforcement, and communication with Hilton-Homewood Suites Franchisor about security issues on the property.

287. Knowledge of the hotel staff and the Homewood Suites Franchisee operating at each hotel is imputed to Hilton-Homewood Suites Franchisor because of the existence of an agency relationship as further described below.

288. Hilton-Homewood Suites Franchisor knew or should have known about the sex trafficking at the San Jose Homewood Suites based on the extensive tools that it used to monitor and supervise this hotel, including but not limited to:

a. obligation of hotel staff and franchisees to report suspected criminal activity, including sex trafficking;

b. regular monitoring of online reviews;

c. collection and monitoring of customer surveys and complaints;

d. requirement that franchisees submit regular and detailed reports about day-to-day hotel operations;

e. collection and monitoring of data about guests, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f. supervision and control over day-to-day operations of the hotel through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisees to use and through which franchisees were obligated to allow Hilton-Homewood Suites Franchisor to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g. regular inspections of the hotel property;

h.  employment of field agents to work with hotels on security issues, including trafficking issues;

i.  access to surveillance and security systems;

j.  information provided by law enforcement; and

k.  Other sources of information uniquely available to Hilton-Homewood Suites Franchisor.

289.  Hilton-Homewood Suites Franchisor knew or should have known about the sex trafficking at the San Jose Homewood Suites because, on information and belief, Hilton-Homewood Suites Franchisor had protocols that required hotel staff, management, and franchisees to report suspected criminal activity, including suspected sex trafficking, to Hilton-Homewood Suites Franchisor.

290.  Upon information and belief, the "red flags" and signs of the widespread sex trafficking at the San Jose Homewood Suites were so prevalent and obvious that hotel staff, management, and the Homewood Suites Franchisee were required to and did make numerous reports to Hilton-Homewood Suites Franchisor about the indicators of sex trafficking activity prior to the time that C.M.S. was trafficked at the San Jose Homewood Suites.

291.  Based on their knowledge of the problem of sex trafficking in the hotel industry, at Hilton hotels, and at the San Jose Homewood Suites, the Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the hotel and to make a

reasonable investigation in response to signs of potential sex trafficking. If these Defendants had used ordinary prudence, they would have been aware of the widespread and ongoing trafficking at the hotel and that they were benefiting from such trafficking.

292. The widespread sex trafficking at each San Jose Homewood Suites was sufficiently obvious and apparent that it was detectable to the Defendants involved in hotel operations if they exercised ordinary diligence.

**K.      There were obvious signs of Jane Doe (C.M.S.)'s trafficking at the San Jose Homewood Suites.**

293. During the period that C.M.S. was trafficked at the San Jose Homewood Suites, there were obvious signs that her traffickers were engaged in sex trafficking:

a.  C.M.S.'s trafficker would sometimes force her to book the room herself. The hotel staff observed her and saw that she was emotional, nervous, and scared.

b.  The hotel rooms in which she was trafficked were frequently paid for with cash.

c.  Hotel staff saw C.M.S. arrive and leave with her traffickers. These traffickers escorted C.M.S. around the hotel and it was apparent they were monitoring her and controlling her movements.

d.  The "Do Not Disturb" door hanger was used very frequently.

e.  Housekeeping staff was often prevented from entering the room for regular cleaning, towel exchange and other standard room services. C.M.S.'s traffickers would require staff to provide towels, linens and other supplies at the door without allowing them to enter.

f.  C.M.S. had many johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

g. There was heavy foot traffic in and out of C.M.S.'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

h. C.M.S.'s continuous trafficking and the associated physical violence, control, threats, and manipulation her traffickers used had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the subject hotels including effects on C.M.S.'s appearance, demeanor, movements throughout the hotels, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that C.M.S. was being continually subjected to coercion, control, and exploitation

i. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well-known "red flags" for trafficking in a hotel.

294. Based upon information and belief, multiple employees at the San Jose Homewood Suites, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

295. As such, Homewood Suites Franchisee knew about or was willfully blind to the fact that C.M.S. was being trafficked at the San Jose Homewood Suites.

296. Given these obvious signs, the Hilton-Homewood Suites Franchisor also knew or should have known about the trafficking of C.M.S. at the San Jose Homewood Suites based on its policy or protocol that required hotel staff, management, and franchisees to report suspected criminal activity including sex trafficking.

297. The signs of C.M.S.'s trafficking were sufficiently obvious and numerous that the Homewood Suites Franchisee was obligated to and, upon information and belief, did report the suspected trafficking to the Hilton-Homewood Suites Franchisor.

298. Hilton-Homewood Suites Franchisor also knew or should have known about C.M.S.'s trafficking based on the other methods, listed above, that they used to monitor and supervise the San Jose Homewood Suites.

299. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Hilton-branded hotels, and at the San Jose Homewood Suites, the Hilton-Homewood Suites Franchisor, and Homewood Suites Franchisee each had a duty to exercise ordinary prudence to detect and respond to signs of sex trafficking at this hotel. Based on the obvious signs of C.M.S.'s sex trafficking at the San Jose Homewood Suites, this sex trafficking was detectable to these Defendants with the exercise of ordinary prudence.

**L.     Homewood Suites Franchisee facilitated the trafficking of C.M.S. at the San Jose Homewood Suites.**

300. Homewood Suites Franchisee is responsible for the acts, omissions, and knowledge of all employees of the San Jose Homewood Suites when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Homewood Suites Franchisee ratified these acts and omissions, and because -Homewood Suites Franchisee failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific

risks, known to Homewood Suites Franchisee, of sex trafficking occurring at Homewood Suites properties including the San Jose Homewood Suites.

301. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the San Jose Homewood Suites, Homewood Suites Franchisee continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including C.M.S.

302. Homewood Suites Franchisee knew or were willfully blind to the fact that C.M.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate C.M.S.'s sexual exploitation.

303. Homewood Suites Franchisee also facilitated widespread trafficking at the Homewood Suites property, including the trafficking of C.M.S., in ways including:

    a. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

    b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

    c. choosing not to report known or suspected criminal activity including sex trafficking to the appropriate law enforcement agencies according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

    d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff; and

e. accommodating specific requests of the traffickers.

**M.     Hilton-Homewood Suites Franchisor facilitated trafficking at the San Jose Homewood Suites, including the trafficking of C.M.S.**

304. Upon information and belief, Hilton-Homewood Suites Franchisor participated directly in aspects of the operation of the San Jose Homewood Suites that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of C.M.S., as follows:

a. assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with hotels on trafficking issues;

f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for guests to report security issues to franchisor;

h. requiring franchisees to provide Wi-Fi/internet access to guests;

i. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

j. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k. requiring franchisees to use a system to monitor and track housekeeping requests;

l. setting policies for when and how housekeeping services are provided;

m. collecting and monitoring data that shows patterns of use of housekeeping services;

n. setting policies for when and how hotel staff can accept tips.

305. Upon information and belief, Hilton-Homewood Suites Franchisor directly participated in and retained day-to-day control over renting rooms at the San Jose Homewood Suites by, among other things:

a. controlling all details of the guest reservation, check-in, and payment processes through both its management and control over all systems used for those processes and its adoption of detailed and specific policies governing the means and methods hotel staff used for each of these processes;

b. directly making reservations for rooms at the San Jose Homewood Suites and accepting payment for those rooms through a central reservation system that it controlled and operated, and which franchisee was required to use;

c. reserving rooms and accepting payments without requiring franchisee approval or involvement;

d. controlling extension of existing room reservations and requiring guests to contact them directly to extend reservations;

e. controlling the payment methods that would be accepted and had access to information about which guests used which payment methods through its backend access to the reservation and payment systems they required their franchisee to use;

f. controlling policies and protocols for guest identity verification at the time of check in;

g. setting room rates, required discounts, mandatory fees, and rewards programs;

h. restricting the ability of hotel staff to refuse or cancel a reservation;

i. collecting, retaining, monitoring, and analyzing detailed data about every guest who stayed at the hotel, including the following categories of information: name, contact information (mailing address, email address, phone number), nationality, date of birth, gender, payment card information, Hilton Honors number, passport information, preferred language, room preference, room selection and assignment, arrival time, additional guest names, corporate travel planner contact information (name, title, company, business phone, email and address), corporate number and name, travel agent number and name, airline partner number and name, vehicle information, images or footage captured by closed circuit television (CCTV), internet or other electronic network activity information, including information regarding a customer's interaction with Hilton websites, applications, or advertisements, IP addresses, Session IDs, Booking engine, Whether a customer has a Hilton and American Express co-branded credit card, whether a customer's Hilton and Amazon accounts are linked, whether a customer's Hilton and Lyft accounts are linked, geolocation information, device information, social media information, demographics data, a customer's usability preferences regarding Hilton's website (such as a customer's email preferences, MyWay preferences, and opt-out preferences), description of a complaint that a customer makes to Hilton, including a customer's free form textual feedback if the customer is a Hilton Honors member, customer ratings and survey responses, and free form textual feedback;[141]

j. establishing detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the hotel until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in;

k. requiring franchisee to use their property management system, which was owned, maintained, controlled, and operated by Hilton-Homewood Suites

---

[141] https://www.hilton.com/en/p/global-privacy-statement/

Franchisor, for virtually all aspects of hotel operations regarding room reservations and payment;

l. assuming sole ownership over all guest information;

m. overseeing do not rent (DNR) lists for its branded properties.

306. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the San Jose Homewood Suites, the Hilton-Homewood Suites Franchisor continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including C.M.S.

307. The Hilton-Homewood Suites Franchisor knew or should have known that C.M.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate C.M.S.'s sexual exploitation.

308. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the San Jose Homewood Suites, the Hilton-Homewood Suites Franchisor continued participating in a venture at that hotel, with their franchisees and the hotel staff, in a way that they knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

a. While Hilton-Homewood Suites Franchisor publicly committed to the EPCAT Code in 2011, they unreasonably delayed and failed to take any significant steps to implement that commitment for several years.[142]

b. Hilton-Homewood Suites Franchisor adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and front-line hotel staff regarding issues related to human trafficking.

c. Hilton-Homewood Suites Franchisor delayed implementation of anti-trafficking training. While Hilton Worldwide committed to the EPCAT Code in 2011, it had completed no training in 2011 and 2012 and had only trained 879 individuals, across all its brands, by the time of its 2013 report.[143]

d. Hilton-Homewood Suites Franchisor implicitly condoned and endorsed its franchisee's repeated decisions not to report trafficking to law enforcement or respond to trafficking appropriately.

e. Hilton-Homewood Suites Franchisor ignored policies that they had purportedly enacted and implemented.

f. Hilton-Homewood Suites Franchisor continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking.

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at the hotel, Hilton-Homewood Suites Franchisor declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at the San Jose Homewood Suites.

h. Hilton-Homewood Suites Franchisor attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

[142] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2012; https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013
[143] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013

i. Hilton-Homewood Suites Franchisor allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

j. Hilton-Homewood Suites Franchisor adopted and required their franchisee to adopt check in procedures that failed to ensure all hotel guests were appropriately identified and, instead, allowed guests to use the hotel with minimal risk of traceability.

k. Hilton-Homewood Suites Franchisor continued to allow the hotel to profit by using brand trademarks despite actual or constructive knowledge of ongoing sex trafficking in that hotel. Lending the perceived legitimacy of the brand d affirmatively facilitated sex trafficking by providing a venue where sex trafficking could occur with minimal risk of detection by law enforcement or traceability.

l. Hilton-Homewood Suites Franchisor provided traffickers with access to internet services that it knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

309. If the Hilton-Homewood Suites Franchisor had exercised ordinary prudence when operating the San Jose Homewood Suites and in the areas where it retained control, Hilton-Homewood Suites Franchisor would have prevented the hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of C.M.S. Instead, the Hilton-Homewood Suites Franchisor engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of C.M.S.

**N.    The ventures at the San Jose Homewood Suites.**

310. Hilton-Homewood Suites Franchisor generated substantial income from the San Jose Homewood Suites, receiving a share of the profits from room rentals collected at the hotel(s). The fees generated by Hilton-Homewood Suites Franchisor

were primarily based on gross room rentals; therefore, Hilton-Homewood Suites Franchisor's profits increased with each room rental at this hotel, including each room rented to a trafficker.

311. Homewood Suites Franchisee profited from every room rented to a trafficker or for use in trafficking at this hotel, both from the room fee and from fees for other hotel services.

312. In ways described more fully above, the Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding, with the population of sex traffickers operating out of the San Jose Homewood Suites, including C.M.S.'s trafficker. (hereinafter "Venture 1").

313. Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee formed this continuous business relationship and implicit understanding with the traffickers at the San Jose Homewood Suites by continuing to rent rooms to be used for trafficking (including C.M.S.'s trafficking) after they knew or should have known that the rooms were being used for unlawful trafficking.

314. This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking, and Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee were generating revenue by renting the hotel rooms.

315. This implicit understanding developed because sex traffickers, including C.M.S.'s, frequently used the San Jose Homewood Suites for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee that created a favorable environment for sex trafficking to flourish at their respective hotel(s).

316. Both Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee participated in this venture by acting jointly to rent rooms to traffickers and to operate their respective hotel(s) in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, the Homewood Suites Franchisee provided "boots on the ground" at their respective hotels, and the Hilton-Homewood Suites Franchisor played a primary role in renting rooms at the San Jose Homewood Suites and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

317. Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee participated in the venture by continuing to rent rooms to traffickers, including C.M.S.'s, after they knew or should have known that victims like Jane Doe C.M.S. were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select their respective hotel(s) as a venue for their illegal activities.

318. Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

- The population of traffickers, including C.M.S.'s, were familiar to the staff at the San Jose Homewood Suites;
- These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the San Jose Homewood Suites but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;
- Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and
- Defendants provided additional services to traffickers (including C.M.S.'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.
- The staff at the San Jose Homewood Suites accommodated the traffickers' requests for preferred locations, which facilitated their illegal activities.

319. The criminal traffickers operating at the San Jose Homewood Suites as part of Venture 1 violated 18 U.S.C. §1591 as to victims, including C.M.S.

320. If Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee had not continued participating in a venture that they knew or should have known

engaged in violations of the TVPRA, they would not have received a benefit from C.M.S.'s trafficking at the San Jose Homewood Suites.

321. In ways described more fully above, Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee also knowingly received a financial benefit from participating in a commercial hotel-operating venture at their respective hotel(s) (hereinafter "Venture 2").

322. Hilton-Homewood Suites Franchisor had a longstanding relationship with its respective franchisee(s) pursuant to which they jointly participated in operation of the San Jose Homewood Suites with a shared goal of maximizing revenue, including gross room revenue.

323. Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee, through their roles in operations at San Jose Homewood Suites as described above, facilitated widespread sex trafficking at the San Jose Homewood Suites by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site.

324. Venture 2 was engaged in violations of the TVRPA through the widespread sex trafficking at the San Jose Homewood Suites, which resulted in C.M.S. and other victims being harbored, maintained, and provided in the rooms of the San Jose Homewood Suites. Venture 2 also engaged in a violation of the TVPRA through the actions of the Homewood Suites Franchisee who—providing boots on the ground

at the San Jose Homewood Suites where the trafficking occurred—violated the TVPRA as perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a)(2).

325. Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Hilton-Homewood Suites Franchisor and Homewood Suites Franchisee participated in the venture by continuing to operate their respective hotels in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of C.M.S. Hilton-Homewood Suites Franchisor continued providing their respective hotels with operational support, use of trademarks, marketing services, and other resources to operate the hotel(s) in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

**O. Hilton-Homewood Suites Franchisor is vicariously liable for the TVPRA violations of Homewood Suites Franchisee.**

326. Hilton-Homewood Suites Franchisor is vicariously liable for the acts, omissions, and knowledge of Homewood Suites Franchisee and staff at the San Jose Homewood Suites, which are the actual agents or subagents of Hilton-Homewood Suites Franchisor.

327. Hilton-Homewood Suites Franchisor subjected Homewood Suites Franchisee to detailed standards and requirements regarding the operation of the San

Jose Homewood Suites through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by Hilton-Homewood Suites Franchisor.

328. Hilton-Homewood Suites Franchisor obscure the full extent of control it exercises over Homewood Suites Franchisee by treating its manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the control that the Hilton-Homewood Suites Franchisor imposed on Homewood Suites Franchisee:

    i. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Homewood Suites Franchisee used;

    j. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions;

    k. dictated the specific manner in which franchisees and hotel staff must carry out most day-to-day functions; and

    l. significantly exceeded what was necessary to protect their registered trademarks.

329. In addition to the ways described above, upon information and belief, the Hilton-Homewood Suites Franchisor exercised and reserved the right to exercise systemic and pervasive control over their respective franchisee(s)'s day-to-day operation of their respective hotels, including the following ways:

- Hilton-Homewood Suites Franchisor required their franchisee and management of the hotel to participate in mandatory training programs,

both during onboarding and on an annual basis, regarding all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary to protect brand trademarks.

- Hilton-Homewood Suites Franchisor retained the right to mandate and control training for hotel staff and actually maintained and controlled training for hotel staff on topics it selected. Hilton-Homewood Suites Franchisor required onsite and online training for all hotel staff, including mandatory training for all hotel-based employees at the time of hire and ongoing training as dictated by Hilton-Homewood Suites Franchisor.

- Hilton-Homewood Suites Franchisor controlled the details of training conducted for hotel staff by franchisee by requiring the use of standardized training methods and materials.

- Hilton-Homewood Suites Franchisor set required staffing levels for the hotel.

- Hilton-Homewood Suites Franchisor adopted detailed job descriptions for each position at the hotel and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

- Hilton-Homewood Suites Franchisor exercised control over the hiring process for hotel staff by mandating interview techniques, setting hiring criteria, and controlling requirements for background and reference check.

- Hilton-Homewood Suites Franchisor retained the right to approve or reject hiring of the general manager of the hotel.

- Hilton-Homewood Suites Franchisor imposed and enforced detailed requirements for all aspects of hotel facilities.

- Hilton-Homewood Suites Franchisor required that their franchisee use Hilton's preferred vendors to purchase goods necessary for day-to-day operation of the hotel.

- Hilton-Homewood Suites Franchisor entered into exclusive purchasing agreements with vendors, including through the Primary Supplier Distribution Program, and required franchisees to purchase goods and supplies from a single source selected by Hilton-Homewood Suites Franchisor. Hilton-Homewood Suites Franchisor did not do this solely to assure uniformity of brand but, instead, did this for their own financial benefit as they routinely received rebates from vendors selected through these purchasing agreements.

- Hilton-Homewood Suites Franchisor required franchisees to participate in a guaranteed rate program through which their franchisee must pay rate difference and pay for gift cards issued to guests if the guests find a room at the hotel at a rate lower than offered through a central reservation system.

- Hilton-Homewood Suites Franchisor controlled channels for guests to report complaints or provide feedback about the hotel.

- Hilton-Homewood Suites Franchisor required franchisees to participate in a Guest Assistance Program and retained the right to require franchisee to take specific actions to resolve guest complaints, including providing rebates and cash refunds.

- Hilton-Homewood Suites Franchisor required their franchisee to use systems Hilton-Homewood Suites Franchisor owned, operated, and controlled for, among other things, revenue management, hotel operations, and business intelligence gathering and analysis.

- Hilton-Homewood Suites Franchisor provided day-to-day services through the back-end operation of the property management system used for virtually all aspects of running the hotel.

- Hilton-Homewood Suites Franchisor required their franchisee to use electronic mail systems maintained by Hilton Worldwide, which are maintained, controlled, and monitored by Hilton Worldwide.

- Hilton-Homewood Suites Franchisor were directly involved in installing hardware and software systems and providing day-to-day maintenance and repair of these systems.

- Hilton-Homewood Suites Franchisor required their franchisee to join and participate in a franchisee association with other branded hotels.

- Hilton-Homewood Suites Franchisor controlled all marketing for the hotel, exercised this control on a day-to-day basis by going beyond setting standards and, instead, requiring their franchisee to get prior approval of any marketing or advertising materials.

- Hilton-Homewood Suites Franchisor set detailed standards regarding the insurance franchisee was required to purchase and maintain, including requirements for specific provisions that must be in the policy, who must be insured, in what amount, and what insurers the franchisee could use.

- Hilton-Homewood Suites Franchisor imposed detailed recordkeeping and reporting requirements on franchisee regarding virtually all aspects of hotel operation, including internal operations.

- Hilton-Homewood Suites Franchisor retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

- Hilton-Homewood Suites Franchisor retained the right to inspect the hotel, including through unannounced inspections, and to perform audits. They inspected and audited virtually all aspects of hotel operations, including internal operations and issues related to guest safety.

- Hilton-Homewood Suites Franchisor retained control to require their franchisee to make operational changes within a time established by Hilton-Homewood Suites Franchisor.

- Hilton-Homewood Suites Franchisor monitored day-to-day operations of the hotel through constant monitoring of guest surveys, online reviews, customer complaints, and data from the back-end of the systems it required their franchisee to use.

  Hilton-Homewood Suites Franchisor retained the right to impose penalties and ultimately to terminate the franchise agreement if their franchisee violated standards, rules, regulations, or expectations.

## VI. C.M.S.'S SEX TRAFFICKING AT THE SUBJECT CHOICE HOTELS.

### A. Choice Hotels knew that sex trafficking was a widespread problem at Choice properties.

330. Use of Choice properties for sex trafficking is well known to Choice Hotels.

331. Upon information and belief, at all relevant times, Choice Hotels has adopted a centralized approach to trafficking-related issues at all its branded properties.

332. Public information, including scores of news stories and online reviews, confirms both the widespread sex trafficking problem at Choice properties and Choice Hotels' knowledge and understanding of the problem.

333. Scores of news stories dating back as far as 2004, highlight Choice Hotel's knowledge of such conduct. Choice knew, or should have known, of Choice branded hotels for sex trafficking. Among other notable press involving the frequent use of Econo Lodge hotels for illegal activity, the following was reported:

- The LA Times reported in February of 2004 "Maria De La Luz Menjivar, 43, of Wilmington was arrested Feb. 4 after the women, all in their 20s, reported the alleged sex slave ring to Anaheim police and officers conducted a sting operation at the Econo Lodge. Police said they were uncertain how many women might have worked at the makeshift brothel. The owner of the motel, Nareshkumar Patel, 44, of Anaheim was arrested with Menjivar on suspicion of running a brothel."[144]

- In November 2012 the Wichita Eagle reported, "Brown was charged with 10 counts each of rape and aggravated human trafficking for having sex with the girls, who are now 14 and 15, at the Econo Lodge at 8302 E. Kellogg in 2010 and 2011. Some of the charges cover a time when the girls were 11 and 12 years old."[145]

- In June of 2014 Tallahassee.com reported, "two other violent confrontations at the Econo Lodge on North Monroe Street involved women working as prostitutes with Backpage ads. On May 1, a man was found shot to death in an Econo Lodge motel room. An Alabama woman, Amber Ward, 18, was arrested in his murder. On May 19, a woman with

[144] https://www.latimes.com/archives/la-xpm-2004-feb-13-me-sexslave13-story.html
[145] https://www.kansas.com/news/local/crime/article1102606.html

a Backpage ad was beaten with a baseball bat and sexually assaulted outside of the same motel." 146

- July 2017 in North Carolina "Two were arrested by the U.S. Marshal's Fugitive Task Force at the Econo Lodge in Burlington. Alamance County Sheriff's Office executed a search warrant in connection with the investigation on Room 224 at the same hotel. The investigation began with a citizen saying his granddaughter was involved in drugs and prostitution. Johnson said multiple hotels have engaged in hosting the prostitution and human trafficking rings."147

- KRDO News in Colorado Springs, CO reported "Colorado Springs man arrested on charges of human trafficking and pimping. Arrest records show a July 12, 2022 incident sparked the investigation after a 21-year-old victim called the Anti-Human Trafficking hotline. Colorado Springs Police officers responded to the Econo Lodge Hotel off North Academy after receiving a report of a person involved in human trafficking. After searching through the Econo Lodge Hotel database, police found that Evans made 81 reservations in the span of about a year."148

- A News Report published on August 13, 2013, in Dothan, Alabama, "Police say Alonso Santiagito held a Mississippi teen against her will, beat her, forced her to do drugs, and sold her for sex. He was holding the girl and other victims at the Quality Inn on Ross Clark Cir."149

- A News report from May of 2014 in Charlotte, North Carolina, "Charlotte-Mecklenburg Police have arrested three people on human trafficking charges. Officers were called out to the Quality Inn on Griffith Street a couple of days ago to investigate a complaint. It's modern-day

146 https://www.tallahassee.com/story/news/local/2014/06/02/sex-trafficking-arrests-tallahassee/9856065/

147 https://greensboro.com/multiple-arrests-in-connection-with-alamance-county-human-trafficking-ring/article_c01dfa4d-cf4e-5443-bb9d-2a483bcc6b77.html

148 https://krdo.com/news/2023/01/12/court-docs-colorado-springs-man-accused-of-human-trafficking-claimed-he-had-57-women/

149 https://www.wtvm.com/story/23122332/dothan-man

slavery, that's what it is, said Dr. Joseph Kuhns, a professor of criminal justice at UNCC."[150]

- Another news report from North Carolina in December of 2014, "The girl told police she was staying with friends in a hotel, the department reported. After talking to her, officers determined that she was a 14-year-old runaway from New York. An investigation revealed she was staying at the Quality Inn, 821 S. Memorial Drive. Maurice Spencer, 21, arrested at the hotel, was charged with human trafficking a child victim and promoting prostitution."[151]
- More recently in a news report from May of 2022 "Mayor Mary-Ann Baldwin said the city has received many complaints about drugs, human trafficking and violence at hotels like the Quality Inn."[152]

- In a news report from Austin, Texas from December 19, 2019 the following was reported, "According to the affidavit, on Oct. 8, police had responded to the Quality Inn at 2751 East Highway 71 westbound service road for a check welfare call. In that case, hotel staff said a victim walked into the lobby, intoxicated and covered in blood, with several injuries. At that time, the victim refused to make a statement to police, but officers noted several things that made them believe she was potentially a human trafficking victim: 1) the person who paid for the victim's room was a man named "Lorenzo Johnson," 2) hotel staff said Johnson had been a customer for the past 28 days and would pay cash for the room every morning, 3) staff said Johnson gave a strict warning that no one should have a room key but him. That day, officers made contact with Johnson and another woman, who were uncooperative. A third woman ran away from the police."[153]

[150] https://www.wcnc.com/article/news/crime/3-arrested-on-human-trafficking-charges-in-charlotte/275-292839989

[151] https://www.reflector.com/news/local/teen-safe-three-in-jail/article_8d512a1d-d11b-5bc2-a477-d4b8e6957c8c.html

[152] https://www.wral.com/city-of-raleigh-deems-quality-inn-on-new-bern-avenue-unsafe-guests-forced-to-leave/20275086/

[153] https://www.kvue.com/article/news/crime/south-austin-swat-call-man-arrested-days-inn/269-a5b5d6f1-d615-470d-a237-b49b2bf476d9

- April 17, 2017 out of Kentucky this was the headline, "Quality Inn employees accused of knowledge, cover-up in human trafficking case"[154]

- In 2013, law enforcement conducted a human trafficking investigation after rescuing a woman who was held captive at a Rodeway Inn in Wisconsin where she was forced to engage in commercial sex.[155]

- In 2014, seven arrests were made at a Rodeway Inn in Maryland as part of a prostitution sting related to a human trafficking investigation.[156]

- In 2014, arrests were made at Rodeway Inn in Colorado as part of a human trafficking investigation.[157]

- In 2015, a man was arrested on trafficking charges following a sting at a Rodeway Inn in Pennsylvania.[158]

- In 2015, seven were arrested on prostitution charges at a Delaware Rodeway Inn as part of a human trafficking investigation.[159]

- In 2015, a man was arrested on sex-trafficking charges following a call from a victim being held captive at a Rodeway Inn in Montana.[160]

[154] https://www.kentuckynewera.com/news/article_862d485e-232b-11e7-bb20-7b6ffe2cd464.html

[155] https://www.wisn.com/article/racine-woman-says-she-was-forced-held-captive-forced-into-prostitution/6316287#

[156] https://www.newarkpostonline.com/news/prostitution-sting-nets-7-arrests-but-real-focus-is-on-human-trafficking/article_6197722d-0cd2-51ed-a8a7-7e8f02e4bb50.html

[157] https://www.wapt.com/article/more-than-a-dozen-face-prostitution-charges-in-rankin-co/2089046#

[158] https://www.lehighvalleylive.com/allentown/2015/11/alleged_pimp_charged_with_huma.html

[159] https://www.cecildaily.com/news/state_news/newark-prostitution-sting-focuses-on-human-trafficking/article_01c98cf2-f638-5c2e-a388-09534c273acb.html

[160] https://www.kulr8.com/news/three-juveniles-among-five-victims-identified-in-billings-sex-trafficking-case/article_d48a8c99-51a0-551a-a5ec-ad67c9232d64.html

- In 2016, a man was arrested on prostitution charges at a Rodeway Inn in Tennessee.[161]

- In 2017, the State of Delaware sought to have a Rodeway Inn declared a public nuisance due to persistent criminal activity, including the hotel manager's involvement in prostitution at the hotel.[162]

- In 2017, three were accused of supervising and managing a prostitution enterprise, including at a Rodeway Inn in Texas.[163]

334. Examples of online reviews that confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Choice hotels include:

- A 2009 review of a Florida Choice property states: "In addition to the room being dirty, I had the unpleasant experience of being woken at 3 in the morning by a phone call of someone wanting to buy drugs! And, they called back more than once! Oh, and I can't forget to mention the hooker in the room next door that had the heart to tell me that she'd be keeping me up that night. This is a horrible, miserable place."[164]

- A 2009 review of a New Jersey Choice property states: "The only problem concerns the possible use of the rooms as a "short stay" type of place. The street is known for prostitution. During my most recent four night stay, two were quiet, one had screams at midnight from an amorous couple next door and one had a police visit to a nearby room due to a man claiming

[161] https://www.theleafchronicle.com/story/news/2016/04/29/clarksville-man-charged-human-trafficking-case/83706230/
[162] https://www.newarkpostonline.com/news/former-rodeway-inn-manager-patronized-prostitutes-at-the-motel-court-documents-say/article_dc7c7008-9447-11e7-9457-9bf5f0959c86.html
[163] https://tylerpaper.com/news/local/shreveport-man-wanted-in-tyler-for-allegedly-operating-a-prostitution-enterprise/article_33815f59-f7d0-55a1-9d33-4abeed22793d.html
[164] https://www.tripadvisor.com/Hotel_Review-g60805-d120147-Reviews-Quality_Inn_Airport-Jacksonville_Florida.html

his "girlfriend" stole his wallet. I would urge the management to place these "short stay" types in a separate section of the motel." [165]

- A 2010 review of an Ohio Choice property states: "About a half hour after we were in our room, there was a knock at the door.and low and behold there was a lady of the evening coming to ask if there was anything she could do for my husband.imagine the laughter!!! Our co-worker was also asked if he needed any service and he replied no thanks .i can get crabs anywhere.LOL So the "big town" of Hilliard has its own prostitution ring.imagine that. I recommend not staying here, unless you like that sort of thing ;)."[166]

- A 2011 review of a North Carolina Choice property states: "We stayed at this hotel on Mothers Day Sunday, despite that there were several parties going on in the surrounding rooms. There were drug dealers sitting in open hotel room doorways trying to sell us drugs. My husband was even solicited for sex by a prostitute when he went out for a candy bar at the vending machine around 8:00 pm. The goings on in the room above us was literally rattling our mirror. Again, this was on a Sunday night (mothers day no less) I would hate to see it on a Friday or Saturday night! Obviously this was not an isolated incident because after dark the front desk is protected in a locked room with bullet proof glass."[167]

- A 2011 review of a Tennesee Choice property states: "The road this motel is on is the best access to a major highway from my home. I am writing to give potential guests a warning. The police are in the parking lot of this motel frequently. I've seen several people I know are convicted felons entering and leaving the property on a regular basis. I've also observed what appears to be drug and prostitution activity in the parking lot on

[165] https://www.tripadvisor.com/Hotel_Review-g46531-d589294-Reviews-Rodeway_Inn-Jersey_City_New_Jersey.html
[166] https://www.tripadvisor.com/Hotel_Review-g50442-d240093-Reviews-Rodeway_Inn-Hilliard_Ohio.html
[167] https://www.expedia.com/Charleston-Hotels-Rodeway-Inn.h459410.Hotel-Reviews

numerous occasions. Unless you want amenities like recreation drug and overnight companionship, look eleswhere."[168]

- A 2011 review of a California Choice property states: "We arrived and there were prostitutes and the place was trashed. We didn't even check in. Four of the five cabs wouldn't pick us up from this location."[169]

- A 2012 review of a Florida Choice property states: "During my stay here everytime I would go outside I was approached by someone wanting to bum a cigarette or wanting to sell me or buy drugs. The staff here are extremely rude to say the least. When I questioned why all the drug dealers and prostitutes I was told by a member of the hotel staff because business is slow."[170]

- A 2013 review of a California Choice property states: "This is the worst hotel I have ever stayed. Place is unkept and the area is very unsafe. Homeless people all around including prostitutes walking by."[171]

- A 2013 review of a California Choice property states: "There are pimps and prostitutes there at night always!!"[172]

- A 2014 review of a New Mexico Choice property states: "We arrived at about 5pm and there were a number of vehicles in the car park, so we thought the place had a number of guests.<1> The receptionist / manageress? advised us on which floor to take a room <2> As we got to our room, a young man was working from a trolley, servicing rooms. Why at 5pm? I tried to speak to him but his English was nil <3>

[168] https://www.tripadvisor.com/Hotel_Review-g30116-d1469364-Reviews-WoodSpring_Suites_Knoxville_Airport-Alcoa_Tennessee.html
[169] https://www.tripadvisor.com/Hotel_Review-g32767-d729348-Reviews-Rodeway_Inn_National_City-National_City_California.html
[170] https://www.tripadvisor.ca/Hotel_Review-g34141-d84259-Reviews-Rodeway_Inn_Clearwater_Largo-Clearwater_Florida.html
[171] https://en.tripadvisor.com.hk/Hotel_Review-g32414-d77011-Reviews-or120-Rodeway_Inn_Suites-Fresno_California.html
[172] https://www.tripadvisor.co.za/Hotel_Review-g33009-d1141193-Reviews-or20-Rodeway_Inn_San_Bernardino-San_Bernardino_California.html

A little later, I went downstairs looking for coffee, and noticed that many of the vehicles had gone <4> Points 1 to 4 did not gel with me until I was in the little dining room and was propositioned by a resident hooker and invited to her room for !!! I refused and went back to our room. All during the evening and night, vehicles arrived and departed, doors opened and closed, so we did not get much sleep. On a couple of sleepless occasions, my wife looked out and observed the people concerned. When we discussed the situation, we realised that it appeared to being used as a "knocking shop". The place is smelly, run down, dirty carpets, and also seems to house people with nowhere else to live. The room was barely acceptable, the bathroom horrible so we did not even risk a shower. The breakfast was deluxe crap and even worse drinks, so we left asap too embarrassed to question the receptionist about their "clients."[173]

- A 2014 review of a North Dakota Choice property states: "The secure entrance into the building was not secure as the door just pulled open, no key required. Most annoying, however, was that we were awakened twice that night by incessant soft tapping at our door and each time a different overly made up young woman apparently looking for business. When I spoke to the clerk on duty the next morning about it, he became quite rude -as though it were MY fault my room was being visited by hookers."[174]

- A 2014 review of a North Carolina Choice property states: "We went out and about for a few hours and when we came back at 6:00 pm found 6 cop cars, a fire truck and a customer was taken away in an ambulance. Cops were questioning guests and looking for someone. The manager did refund our money and we promptly left. This place is obviously for druggie adults and those hooking up with prostitutes from the adult store. Disgusting."[175]

- A 2014 review of a Michigan Choice property states: "Got there around 3 am. Got my access card. Door was wedged open. Light switch didnt work.

[173] https://www.tripadvisor.com/Hotel_Review-g47029-d92827-Reviews-Rodeway_Inn_Farmington-Farmington_New_Mexico.html
[174] https://www.tripadvisor.co.za/Hotel_Review-g49785-d95007-Reviews-or70-Rodeway_Inn-Fargo_North_Dakota.html
[175] https://www.tripadvisor.com/Hotel_Review-g49680-d243982-Reviews-Rodeway_Inn_Winston_Salem_Route_52-Winston_Salem_North_Carolina.html

PLAINTIFF'S SECOND AMENDED COMPLAINT 136

Had to go to the desk to get towels and such. Also, this hotel allows prostitution."[176]

- A 2015 review of a California Choice property states: "Beware it's a favorite place for working girls of the night to do business. After informing the management of the volume of traffic and being solicited with the offer of sex and crystal meth by two transgendered prostitutes, nothung was done. I returned to stay there agsin and the girls are still there.Rodeway is the sex highway if you are into that sort of thing."[177]

- A 2015 review of a Florida Choice property states: "What you can't see from online photos is that it's directly next to a strip club, and a couple cop cars are in and out about every hour.At 4 am we were woken by about 15 cops stomping past our room to bust a bunch of cookers 3 doors down. The woman at the front desk apparently lives there, and is a bad caricature. Upon day light morning hours, a few stray hookers were loitering in the parking lot, and the parking lot is strewn with old hypodermic needles and used condoms."[178]

- A 2015 review of a North Carolina Choice property states: "A/C was broke, no alarm clock, hookers and pimps everywhere."[179]

- A 2015 review of a Georgia Choice property states: "I suggest you stay away as the hotel is quite empty but the few rooms that are taking are full with PIMPS, Escort service, Backpage prostitutes, drug dealers and other things that shouldnâ€™t be. But at the end they are the oneâ€™s paying the crazy price of $70.00 a night plus tax. So the management . . . . that live there onsite. Turns there head to what is going on and allows it to happen."[180]

---

[176] https://www.tripadvisor.com/Hotel_Review-g42391-d95270-Reviews-Rodeway_Inn-Lansing_Ingham_County_Michigan.html
[177] https://www.yelp.com/biz/rodeway-inn-oceanside
[178] https://www.yelp.com/biz/rodeway-inn-clearwater
[179] https://www.expedia.com/Wilmington-Hotels-Rodeway-Inn-Suites-Wilmington-North.h1158075.Hotel-Reviews
[180] https://www.tripadvisor.com/Hotel_Review-g35152-d225201-Reviews-Rodeway_Inn_Norcross-Norcross_Georgia.html

- A 2015 review of a California Choice property states: "hookers come and go & you'll here them in the next room working."[181]

335. Thus, Choice Hotels knew or should have known that:

a. There was widespread and ongoing sex trafficking occurring at Choice properties, including without limitation each of the Subject Choice Hotels.

b. Sex trafficking was a brand-wide problem for Choice originating from management level decisions.

c. Choice Hotel Franchisees and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

d. The efforts of Choice Hotels, if any, to stop facilitating sex trafficking at its branded properties were not effective.

e. Choice Hotels was earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

336. Despite the continually mounting evidence that sex trafficking at Choice properties was ongoing and growing, the Choice Hotel Defendants did not change course. The Choice Hotel Defendants chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

---

[181] https://www.yelp.com/biz/rodeway-inn-and-suites-pacific-coast-highway-harbor-city?adjust_creative=BVEBPoq--TWajj2yXuxEeg&start=20&utm_campaign=yelp_api_v3&utm_medium=api_v3_business_search&utm_source=BVEBPoq--TWajj2yXuxEeg

### B. There was widespread and obvious trafficking at the Subject Choice Hotels.

337. There was widespread and ongoing sex trafficking at each of the Subject Choice Hotels.

338. There were open and obvious signs of the sex-trafficking activity occurring at each of the Subject Choice Hotels.

339. Online reviews confirm that there was widespread sex trafficking and other associated criminal activity at the Subject Choice Hotels. Examples of reviews include:

- A 2009 review of the Escondido Econo Lodge states "On our first night, we watched a pi mp waiting in the parking lot for his two prostitutes to meet him. (told us what the neighborhood was like)."[182]

- A 2015 review for the Oceanside Rodeway Inn states "Beware it's a favorite place for working girls of the night to do business. After informing the management of the volume of traffic and being solicited with the offer of sex and crystal meth by two transgendered prostitutes, nothung was done. I returned to stay there agsin and the girls are still there.Rodeway is the sex highway if you are into that sort of thing."[183]

- A 2018 review for the Oceanside Rodeway Inn states "As long as you donâ€™t look outside after midnight you wonâ€™t notice that itâ€™s a popular parking lot for guys to park in with prostitutes... watch out for condoms when youâ€™re walking around. My girlfriend went out for a cigarette and was approached by a man with a wad of cash in his hand, no lie!"[184]

---

[182] https://www.expedia.com/Escondido-Hotels-Econo-Lodge-Inn-Suites-Escondido-Downtown.h909456.Hotel-Reviews

[183] https://www.yelp.com/biz/rodeway-inn-oceanside

[184]

- A 2018 review for the Escondido Econo Lodge states "Walked out the door in the morning and there was prostitutes coming out of other rooms too...find out in a few minutes the prostitute stole some things. Just do not stay here."[185]

340. Traffickers, including C.M.S.'s traffickers, repeatedly chose to use each of the Subject Choice Hotels for their sex-trafficking activity.

341. Upon information and belief, each of the Subject Choice Hotels had a population of traffickers who operated out of the hotel, who were known to hotel staff, and whose activities followed recognized patterns of trafficking that were, at all relevant times, known in the hotel industry and known to the Choice Hotels and the Choice Hotel Franchisees.

342. These traffickers, including C.M.S.'s trafficker, operated at each of the Subject Choice Hotels with little regard for concealment, due to an implicit understanding between the hotel staff and the traffickers. This understanding enabled the traffickers to operate freely without expending significant resources on concealment, as they had found venues where they could conduct their operations without disruption.

343. Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the each of

---

[185] https://www.yelp.com/biz/econo-lodge-inn-and-suites-escondido-downtown-escondido

the Subject Choice Hotels prior to C.M.S.'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

344. At each of the Subject Choice Hotels, hotel staff—including management-level staff—witnessed, observed, was informed about, and otherwise learned about the obvious red flags of the trafficking activity occurring at each hotel.

345. Each of the Choice Hotel Franchisees knew about the sex trafficking occurring at its respective hotel through its on-the-ground role operating the hotel and through the knowledge of the hotel staff it employed. Each of the Choice Hotel Franchisees provided boots on the ground at its respective hotel and thus directly observed the obvious signs of sex trafficking at this hotel.

346. Each of the Choice Hotel Franchisees also knew or should have known about the widespread and ongoing sex trafficking at its respective hotel based on the

tools that it used or had available to monitor the hotel, including guest feedback, surveillance monitoring, internal investigations, communication with law enforcement, and communication with Choice Hotels about security issues on the property.

347. Knowledge of the hotel staff and the Choice Hotels Franchisees operating at each hotel is imputed to Choice Hotels because of the existence of agency relationships, as further described below.

348. Choice Hotels knew or should have known about the sex trafficking at the Subject Choice Properties based on the extensive tools that Choice Hotels used to monitor and supervise each of the Subject Choice Hotels, including but not limited to, because it:

a. Collection and review of surveillance footage from the Subject Choice Properties by Choice Hotels;

b. Choice Hotels' protocol that, on its face, required staff of the Subject Choice Properties and Franchisees to report suspected criminal activity and suspected trafficking to Choice Hotels;

c. Choice Hotels' regular, unannounced inspections of the Subject Choice Properties;

d. Information obtained by Choice Hotels' field-based associates that visited hotels, including the Subject Choice Properties, to discuss trafficking. to discuss human trafficking issues;

e. Franchisees and the Choice Hotels' joint involvement in soliciting, monitoring, analyzing, and responding to guest surveys and guest complaints;

f. Choice Hotels' capture, retention, and analysis of extensive data about all aspects of the operation through the backend of systems it required Franchisees to use at the Subject Choice Properties.

349. Choice Hotels knew or should have known about the sex trafficking at the Subject Choice Hotels because, on information and belief, Choice Hotels had protocols that required hotel staff, management, and franchisees to report suspected criminal activity, including suspected sex trafficking, to Choice Hotels.

350. Upon information and belief, the "red flags" and signs of the widespread sex trafficking at each of the Subject Choice Hotels were so prevalent and obvious that hotel staff, management, and the Choice Hotel Franchisees were required to and did make numerous reports to the Choice Hotels about the indicators of sex trafficking activity prior to the time that C.M.S. was trafficked at the Subject Choice Hotels.

351. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Choice Hotels, and at the Subject Choice Hotels, the Choice Hotels, and Choice Hotel Franchisees each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at their respective hotel(s) and to make a reasonable investigation in response to signs of potential sex trafficking. If these Defendants had used ordinary prudence, they would have been aware of the widespread and ongoing trafficking at their respective hotel(s) and that they were benefiting from such trafficking.

352. The widespread sex trafficking at each of the Subject Choice Hotels was sufficiently obvious and apparent that it was detectable to the Defendants involved in hotel operations if they exercised ordinary diligence.

**C. It was apparent and obvious that C.M.S. was being trafficked at the Subject Choice Hotels.**

353. During the period that C.M.S. was trafficked at the Subject Choice Hotels, there were obvious signs that her traffickers were engaged in sex trafficking:

    a. C.M.S.'s trafficker would sometimes force her to book the room herself. The hotel staff observed her and saw that she was emotional, nervous, and scared.

    b. The hotel rooms in which she was trafficked were frequently paid for with cash.

    c. Hotel staff saw C.M.S. arrive and leave with her traffickers. These traffickers escorted C.M.S. around the hotel and it was apparent they were monitoring her and controlling her movements.

    d. The "Do Not Disturb" door hanger was used very frequently.

    e. Housekeeping staff was often prevented from entering the room for regular cleaning, towel exchange and other standard room services. C.M.S.'s traffickers would require staff to provide towels, linens and other supplies at the door without allowing them to enter.

    f. C.M.S. had many johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

    g. There was heavy foot traffic in and out of C.M.S.'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

    h. C.M.S.'s continuous trafficking and the associated physical violence, control, threats, and manipulation her traffickers used had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the subject hotels including

effects on C.M.S.'s appearance, demeanor, movements throughout the hotels, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that C.M.S. was being continually subjected to coercion, control, and exploitation

i. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

354. Based upon information and belief, multiple employees at each of the Subject Choice Hotels, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

355. As such, each of the Choice Hotel Franchisees knew about or was willfully blind to the fact that C.M.S. was being trafficked at the defendant's respective hotel.

356. Given these obvious signs, Choice Hotels also knew or should have known about the trafficking of C.M.S. at the Subject Choice Hotels based on its policy or protocol that required hotel staff, management, and franchisees to report suspected criminal activity, including sex trafficking.

357. The signs of C.M.S.'s trafficking were sufficiently obvious and numerous that the Choice Hotel Franchisees were obligated to and, upon information and belief did, report the suspected trafficking at their respective hotels to Choice Hotels.

358. Choice Hotels also knew or should have known about C.M.S.'s trafficking based on the other methods, listed above, that they used to monitor and supervise the Subject Choice Hotels.

359. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Choice branded hotels, and at the subject hotels, each of the Choice Hotel Franchisees and Choice Hotels had a duty to exercise ordinary prudence to detect and respond to signs of sex trafficking at its respective hotel(s). Based on the obvious signs of C.M.S.'s sex trafficking at the Subject Choice Hotels, this sex trafficking was detectable to these Defendants with the exercise of ordinary prudence.

**D. The Choice Hotel Franchisees actively facilitated sex trafficking at the Subject Choice Hotels, including the trafficking of C.M.S.**

360. Each of the Choice Hotel Franchisees facilitated sex trafficking at its respective hotel.

361. The Choice Hotel Franchisees are responsible for the acts, omissions, and knowledge of all employees of their respective hotels when operating those hotels because these acts and omissions were committed in the scope and course of employment, because the Choice Hotel Franchisees ratified these acts and omissions, and because the Choice Hotel Franchisees failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to the Choice Hotel Franchisees , of sex trafficking occurring at their respective hotels.

362. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at their respective hotels, the Choice Hotels Franchisees continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including C.M.S.

363. The Choice Hotel Franchisees knew or were willfully blind to the fact that C.M.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate C.M.S.'s sexual exploitation.

364. The Choice Hotel Franchisees also facilitated widespread trafficking at their respective hotel, including the trafficking of C.M.S., in ways including:

    f. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

    g. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

    h. choosing not to report known or suspected criminal activity including sex trafficking to the appropriate law enforcement agencies according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

    i. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

    j. Developing familiar relationships with traffickers who operated out of their respective hotel and accommodating specific requests that these traffickers made, such as requests regarding preferred room locations.

**E.  Choice Hotels facilitated trafficking at the Subject Choice Hotels, including the trafficking of C.M.S.**

365. Upon information and belief, Choice Hotels participated directly in aspects of the operation of the Subject Choice Properties that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of C.M.S., as follows:

a. assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with hotels on trafficking issues;

f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for guests to report security issues to franchisor;

h. requiring franchisees to provide Wi-Fi/internet access to guests;

i. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

j. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k. requiring franchisees to use a system to monitor and track housekeeping requests;

l. setting policies for when and how housekeeping services are provided;

m. collecting and monitoring data that shows patterns of use of housekeeping services;

366. Choice Hotels directly participated in and retained day-to-day control over renting rooms at the Subject Choice Hotels by, among other things:

- Choice Hotels controlled all details of the guest reservation, check-in, and payment processes through its management of and control over all systems used for those processes and through its adoption and enforcement of detailed and specific policies dictating the means and methods used for the day-to-day implementation of these processes.

- Choice Hotels directly took reservations for rooms at the Subject Choice Properties and accepted payment for those rooms through a central reservation system ("CRS") that it controlled and operated. This CRS included a toll-free telephone reservation system, a proprietary internet site, mobile phone and tablet reservation applications, and interfaces with global distribution systems and other internet reservation sites.

- Choice Hotels could make reservations and take payment for rooms at the Subject Choice Properties without any involvement or approval by Franchisee.

- Choice Hotels directly entered into agreements with third parties regarding the distribution of room inventory in its branded hotels, including its franchised hotels.[186]

- When a guest did not make a reservation in advance through the CRS, Choice Hotels nonetheless controlled the specific process used to register a walk-in guest and generate a reservation for that guest.[187]

---

[186] https://www.sec.gov/Archives/edgar/data/1046311/000104631117000006/chh1231201610-k.htm

[187] https://www.Choice Hotelsadvantage.com/cA_Functionality.pdf

- Choice Hotels set or otherwise controlled room prices, required discounts, and reward programs. Choice Hotels also controlled the room rates offered to each guest.[188]

- Choice Hotels controlled all data related to room rentals; every time someone makes a reservation, checks in, or checks out, the transaction goes directly through Choice Hotels' data center.[189]

- Choice Hotels controlled and restricted the ability of Franchisees and hotel staff to refuse or cancel a reservation.

- Choice Hotels established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Choice Properties until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

- Choice Hotels required Franchisees to use the Choice ADVANTAGE property management system, which was owned, maintained, and controlled by Choice Hotels, for virtually all aspects of hotel operations related to room rentals. Through the backend of this system, Choice Hotels exercised control over day-to-day processes.

- Choice Hotels maintained back-end access to the Choice ADVANTAGE property management system, which it used to collect, track, and report comprehensive information about each guest at the Subject Choice Properties.

- Choice Hotels also participated in day-to-day operations regarding reservations by synchronizing the rate and inventory information for the Subject Choice Properties with the CRS and making day-to-day decisions about rates.

367. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Choice Hotels, the Choice Hotels continued

---

[188] https://www.Choice Hotelsadvantage.com/cA_Functionality.pdf
[189] https://www.raritan.com/resources/case-studies/detail/no-sleepless-nights-for-Choice Hotels-hotels-data-center-team

renting rooms to traffickers, including the rooms used to sexually exploit victims, including C.M.S.

368. The Choice Hotels knew or should have known that C.M.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate C.M.S.'s sexual exploitation.

369. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Choice Hotels, the Choice Hotels continued participating in a venture at that hotel, with their franchisees and the hotel staff, in a way that they knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

- adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including C.M.S.'s traffickers, to secure rooms without providing their own identifying information;

- adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including C.M.S.'s traffickers, to pay for rooms using non-traceable methods;

- adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

- adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

- providing traffickers continued access to Choice-maintained internet systems despite having or constructive knowledge this access was being used for advertising services related to their trafficking activities;

- adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at the Subject Choice Properties;

- implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

370. If the Choice Hotels had exercised ordinary prudence when operating Choice Hotel Properties and in the areas where they retained control, Choice Hotels would have prevented the Subject Choice Hotels from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of C.M.S. Instead, Choice Hotels engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of C.M.S.

**F.  The ventures at the Subject Choice Hotels.**

371. Choice Hotels generated substantial income from the Subject Choice Hotels, receiving a share of the profits from room rentals collected at these hotels. The fees generated by the Choice Hotels were primarily based on gross room rentals; therefore, the Choice Hotels' profits increased with each room rental at their respective hotel(s), including each room rented to a trafficker.

372. Each Choice Hotel Franchisee profited from every room rented to a trafficker or for use in trafficking at its respective hotel, both from the room fee and from fees for other hotel services.

373. In ways described more fully above, Choice Hotels and Choice Hotel Franchisees knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, with the population of sex traffickers operating out of their respective hotel(s), including C.M.S.'s trafficker. (hereinafter "Venture 1").

374. Choice Hotels and Choice Hotel Franchisees formed this continuous business relationship and implicit understanding with the traffickers at their respective hotel(s) by continuing to rent rooms to be used for trafficking (including C.M.S.'s trafficking) after they knew or should have known that the rooms were being used for unlawful trafficking.

375. This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and Choice Hotels and Choice Hotel Franchisees were generating revenue by renting the hotel rooms.

376. This implicit understanding developed because sex traffickers, including C.M.S.'s, frequently used each of the Subject Choice Hotels for their trafficking knowing that staff members would look the other way. This occurred because of the

acts and omissions of Choice Hotels and Choice Hotel Franchisees that created a favorable environment for sex trafficking to flourish at their respective hotel(s).

377. Both Choice Hotels and Choice Hotel Franchisees participated in this venture by acting jointly to rent rooms to traffickers and to operate their respective hotel(s) in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, the Choice Hotel Franchisees provided "boots on the ground" at their respective hotels, and Choice Hotels played a primary role in renting rooms at each of the Subject Choice Hotels and retained control over and were directly involved in aspects of hotel operations related to sex trafficking.

378. Choice Hotels and Choice Hotel Franchisees participated in the venture by continuing to rent rooms to traffickers, including C.M.S.'s, after they knew or should have known that victims like Jane Doe C.M.S. were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select their respective hotel(s) as a venue for their illegal activities.

379. Choice Hotels and Choice Hotel Franchisees did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation

with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

- The population of traffickers, including C.M.S.'s, were familiar to the staff at each of the Subject Choice Hotels;

- These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at each of the Subject Choice Hotels but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

- Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

- Defendants provided additional services to traffickers (including C.M.S.'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

- The staff at each of the Subject Choice Hotels accommodated the traffickers' requests for preferred locations, which facilitated their illegal activities.

380. The criminal traffickers operating at the Subject Choice Hotels as part of Venture 1 violated 18 U.S.C. §1591 as to victims, including C.M.S.

381. If Choice Hotels and Choice Hotel Franchisees had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from C.M.S.'s trafficking at the Subject Choice Hotels.

382. In ways described more fully above, Choice Hotels and Choice Hotel Franchisee also knowingly received a financial benefit from participating in a

commercial hotel-operating venture at their respective hotel(s) (hereinafter "Venture 2").

383. Choice Hotels had a longstanding relationship with each of its franchisees pursuant to which they jointly participated in operation of their respective hotel with a shared goal of maximizing revenue, including gross room revenue.

384. Choice Hotels and Choice Hotel Franchisees, through their roles in operations at their respective hotel(s) as described above, facilitated widespread sex trafficking at their respective hotel(s) by continuing to operate the hotel(s) in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site.

385. Venture 2 was engaged in violations of the TVRPA through the widespread sex trafficking at each of the Subject Choice Hotels, which resulted in C.M.S. and other victims being harbored, maintained, and provided in the rooms of the Subject Choice Hotels. Venture 2 also engaged in a violation of the TVPRA through the actions of the Choice Hotel Franchisees who—providing boots on the ground at their respective hotel(s) where the trafficking occurred—violated the TVPRA as perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a)(2).

386. Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Choice Hotels and Choice Hotel Franchisees participated in the venture by continuing to operate their respective hotels in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of C.M.S. Choice Hotels continued providing their respective hotels with operational support, use of trademarks, marketing services, and other resources to operate the hotel(s) in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

**G. Choice Hotels is vicariously liable for the TVPRA violations of its respective franchisees.**

387. Choice Hotels is vicariously liable for the acts, omissions, and knowledge of its franchisees and staff at their respective hotels, which are their actual agents or subagents of Choice Hotels.

388. Choice Hotels subjected its franchisees to detailed standards and requirements regarding the operation of the Subject Choice Hotels through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by Choice Hotels.

389. Choice Hotels obscures the full extent of control they exercise over their franchisees by treating the manuals and certain policies as confidential and proprietary

and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that Choice Hotels imposed on the franchisees:

    a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used;

    b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions;

    c. dictated the specific manner in which franchisees and hotel staff must carry out most day-to-day functions; and

    d. significantly exceeded what was necessary to protect their registered trademarks.

390. In addition to the ways described above, upon information and belief, Choice Hotels exercised and reserved the right to exercise systemic and pervasive control over their franchisees' day-to-day operation of their respective hotels, including the following ways:

- The Choice Brand Defendants required Franchisees and management of the Subject Choice Properties to participate in mandatory training programs, both during onboarding and on an annual basis, regarding all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for The Choice Brand Defendants to protect its trademarks.

- The Choice Brand Defendants retained the right to mandate and control training for hotel staff and actually maintained and controlled training for hotel staff on topics it selected.

- The Choice Brand Defendants controlled the details of training conducted for hotel staff by Franchisees by requiring the use of standardized training methods and materials, including developing online, role-specific training that Franchisees was required to use.

- The Choice Brand Defendants adopted detailed job descriptions for each position at the Subject Choice Properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

- The Choice Brand Defendants set required staffing levels for the Subject Choice Properties

- The Choice Brand Defendants exercised significant control over the procurement decisions of Franchisees by requiring it to buy products from "qualified vendors" and limiting its ability to purchase products from other vendors.

- The Choice Brand Defendants imposed and enforced detailed requirements for all aspects of hotel facilities.

- The Choice Brand Defendants controlled channels for guests to report complaints or provide feedback regarding the Subject Choice Properties and directly participated in the response and/or supervised and dictated Franchisee's response to customer complaints or other feedback.

- The Choice Brand Defendants required the Subject Choice Properties to participate in a mandatory guest complaint resolution system operated, managed, and overseen by The Choice Brand Defendants.

- The Choice Brand Defendants required Franchisees to join and participate in a Franchisees association with other The Choice Brand Defendants brand hotels.

- The Choice Brand Defendants controlled all marketing for the Subject Choice Properties, including all website pages, and prohibited Franchisees from using any website, social media, advertising, or other public communication without written approval from The Choice Brand Defendants.

- The Choice Brand Defendants required Franchisees to refer all guests who it could not accommodate to other The Choice Brand Defendants-branded hotels.

- The Choice Brand Defendants required Franchisees to purchase insurance and set specific requirements for that insurance.

- The Choice Brand Defendants imposed detailed recordkeeping and reporting requirements on Franchisees regarding virtually all aspects of hotel operation.

- The Choice Brand Defendants collected, monitored, and analyzed dozens of reports regarding the Subject Choice Properties through the backend of The Choice Brand DefendantsADVANTAGE property management system and used these reports to supervise and control the day-to-day operations of the Subject Choice Properties.

- The Choice Brand Defendants collected, monitored, and analyzed guest information in two separate systems: the CIS (Customer Information System) and the GIS (Guest Insight System) through the backend of The Choice Brand DefendantsADVANTAGE property management system and used this information to supervise, monitor, manage, and control the day-to-day operations of the Subject Choice Properties.

- The Choice Brand Defendants retained the virtually unlimited right to supervise the day-to-day operations of the Subject Choice Properties by retaining the right to implement any automatic reporting systems it elected to use.

- The Choice Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

- The Choice Brand Defendants retained the right to inspect the Subject Choice Properties, including through unannounced inspections.

- The Choice Brand Defendants retained the right to impose penalties, including but not limited to written warnings, payment of re-inspection, non-compliance, and guest satisfaction fees, attendance at mandatory training programs and ultimately to the termination of the franchise agreement, on Franchisees for violations of any rule, policy, or standard promulgated by The Choice Brand Defendants.

- Other actions that deprived Franchisees of independence in the business operations of the Subject Choice Properties.

391. The Choice Brand Defendants specifically retained control of the day-to-day operation of Choice Franchisees with regards to aspects of operation of the subject the Subject Choice Properties that caused C.M.S.'s harm, including but not limited to

reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

392. Upon information and belief, Choice Hotels had the right to and did enforce their control over Choice Hotels through various methods, including:

    a. the right to conduct detailed inspections of the subject properties;

    b. monitoring or auditing the Franchisees for compliance with policies and expectations;

    c. directing Franchisees to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

    d. mandating training and education for franchisees and/or hotel staff;

    e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

    f. the right to impose fines or penalties;

    g. the right to impose additional conditions on franchisee or to restrict or limit their right to provide goods and services; and

    h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

393. At all relevant times, Choice Hotel Franchisees acted as the actual agents of the Choice Hotels when operating the Subject Choice Properties.

## VII. C.M.S.'S SEX TRAFFICKING AT SAN DIEGO EXTENDED STAY AMERICA.

## A. Extended Stay America Defendants' knowledge of widespread and ongoing sex trafficking at their branded hotels.

394. The use of Extended Stay America properties for sex trafficking is well known to the Extended Stay America Defendants. Information that has become public through news stories and online reviews establishes the entrenched and pervasive nature of Extended Stay America properties in providing a venue where sex trafficking has continued unabated for years.

395. Examples of news stories and online reviews that demonstrate the severity and pervasiveness of prostitution, sex trafficking, and other associated criminal activity at Extended Stay America properties, include:

- In 2011, an arrest was made at a Columbus area Extended Stay America property as part of an online prostitution sting.[190]

- In 2011, a man was arrested in Louisiana after holding a teenage girl at an Extended Stay America for three days and forcing her into commercial sex work.[191]

- A Maryland man was convicted on human trafficking charges after being arrested in August 2012 for operating out of an Extended Stay America property in Columbia.[192]

- A 2012 review of an Extended Stay America in Akron, Ohio stated: "This hotel is in need of TOTAL remodeling and TOTAL MGT. replacement...I experienced no hot water, unclean office, hallways, rooms, and to top it

[190] https://www.ledger-enquirer.com/news/local/article29169064.html
[191] https://www.wafb.com/story/13941248/police-say-missing-teen-was-forced-into-prostitution/
[192] https://www.baltimoresun.com/maryland/howard/columbia/ph-ho-cf-sex-trafficking-0801-20130730-story.html

all off..during my stay I witnessed a Police bust for Drugs and Prostitution..needless to say, I would NEVER recommend this hotel nor would I EVER stay here again...go to Stay Place down the street...nicer..cleaner...quieter...SAFER...."[193]

- In 2012, a woman was arrested for maintaining a room in a North Carolina Extended Stay America property as a place for prostitution.[194]

- In 2013, a man was charged with operating a brothel from a room at an Extended Stay America property in California.[195]

- In 2013, a man was indicted on human trafficking charges after trafficking a teenage girl at locations including a Tennessee Extended Stay America property.[196]

- In 2013, two were charged with prostituting a teenage girl after putting her in a room at an Extended Stay America property in Missouri for a two-week period where she engaged in commercial sex.[197]

- In 2013, two were arrested on human trafficking charges following an investigation at an Extended Stay America property in Florida.[198]

- A 2014 review of an Extended Stay of America property in Texas noted "The hotel caters to scum, crack addicts, prostitutes."[199]

---

[193] https://www.tripadvisor.com/ShowUserReviews-g50236-d101417-r147725990-Extended_Stay_America_Akron_Copley_West-Copley_Ohio.html
[194] https://www.wral.com/story/woman-charged-after-two-children-found-in-room-used-for-prostituion/11036300/
[195] https://newsantaana.com/man-charged-with-operating-a-brothel-in-irvine/
[196] https://www.justice.gov/usao-wdtn/pr/osbie-antonio-sea-indicted-sex-trafficking-14-year-old-girl-and-two-others
[197] https://www.stltoday.com/news/local/stcharles/two-accused-of-prostituting-teen-in-st-peters-hotel-room/article_67366bb0-bef4-11e1-8098-001a4bcf6878.html
[198] https://www.sun-sentinel.com/2013/08/20/human-trafficking-suspects-accused-of-prostituting-women-in-plantation-2/
[199] https://www.tripadvisor.com/ShowUserReviews-g30196-d217731-r216084275-Extended_Stay_America_Austin_North_Central-Austin_Texas.html

- A 2014 review of an Extended Stay of America property in Washington noted the hotel was "drug dealer and prostitute infested."[200]

- In 2014, a man was arrested on trafficking charges for forcing an 18 year old girl to perform commercial sex at a Massachusetts Extended Stay America.[201]

- In 2015, a man was arrested as part of a prostitution sting at an Extended Stay America property in Ohio.[202]

- In 2016, six people were arrested following a prostitution sting at an Extended Stay America property in Ohio.[203]

- A 2016 review of an Extended Stay America property in North Carolina noted "Was offered companionship in parking lot. Doors banging all night. Drug dealers prevelant on property. Not kid friendl. I reported all this Management does not care."[204]

- A 2018 review for a Florida Extended Stay America property noted "Prostitutes are obvious around the hotel at night."[205]

---

[200] https://www.tripadvisor.com/ShowUserReviews-g58537-d225969-r213496204-Extended_Stay_America_Seattle_Kent-Kent_Washington.html

[201] https://www.patriotledger.com/story/news/crime/2016/01/30/local-motels-hotels-are-hotbeds/32534523007/

[202] https://www.thelantern.com/2015/12/columbus-police-sting-operation-lead-to-adolphus-washington-solicitation-citation/#:~:text=Washington%20was%20charged%20and%20released,America%20hotel%20in%20Worthington%2C%20Ohio.

[203] https://www.pressreader.com/usa/dayton-daily-news/20160226/282063391043820

[204] https://www.tripadvisor.com.sg/ShowUserReviews-g49463-d100747-r352238410-Extended_Stay_America_Suites_Raleigh_Midtown-Raleigh_North_Carolina.html

[205] https://www.tripadvisor.co.nz/ShowUserReviews-g60805-d88463-r611312631-Extended_Stay_America_Jacksonville_Lenoir_Avenue_East-Jacksonville_Florida.html

396. Upon information and belief, the Extended Stay America Defendants monitored both news stories and online reviews which provided them with notice of widespread criminal activity, including sex trafficking, at their branded properties.

397. This sampling of news stories, reviews, and other public information establishes that, at the time C.M.S. was trafficked at its hotel, the Extended Stay America Defendants knew, at least, that:

   a. There was widespread and ongoing sex trafficking occurring at their branded properties.

   b. Sex trafficking was a brand-wide problem stemming from their top-level decisions.

   c. Their branded hotels were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

   d. Their efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

   e. They were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

398. Despite the mounting evidence that sex trafficking at their properties was ongoing and growing, the Extended Stay America Defendants continued to earn revenue through conduct that they knew or should have known would continue to facilitate that trafficking.

### B. Sex trafficking was widespread at the San Diego Extended Stay America.

399. ESA was specifically aware that sex trafficking was widespread and ongoing at the Subject Extended Stay America.

400. Traffickers, including C.M.S.'s trafficker, repeatedly chose to use the Subject Extended Stay America for their sex trafficking activity because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. There were obvious and apparent signs of this widespread trafficking activity, consistent with the well-known "red flags" of sex trafficking in the hospitality industry, that ESA knew or should have known about.

401. Online reviews confirm that there was open and obvious criminal activity associated with trafficking occurring at the Subject Extended Stay America:

402. Upon information and belief, and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Subject Extended Stay America prior to and after C.M.S.'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above.

403. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided ESA with notice that these victims were being subject to violence, coercion, control, and exploitation.

404. All knowledge from the staff at the Subject Extended Stay America is imputed to ESA. Thus, ESA knew about this widespread and ongoing trafficking at the Subject Extended Stay America, including the trafficking of C.M.S. through the direct observations of hotel staff, including management-level staff.

405. Upon information and belief, ESA knew or should have known about widespread and ongoing trafficking activity at the hotel property because of non-public information available because ESA:

    a. conducted regular inspections of the hotel property;

    b. employed "field agents" to work with hotels on trafficking issues;

    c. publicly represented that it monitored and audited hotels to determine the status of anti-trafficking efforts;

    d. required hotel staff to report suspected trafficking activity to ESA;

    e. had access to surveillance systems;

    f. collected and monitored data that showed patterns consistent with trafficking;

g. participated in internal investigations;

h. solicited and received customer feedback and complaints;

406. Upon information and belief, ESA adopted a protocol that, on its face, required hotel staff to report suspected criminal activity, including suspected prostitution and sex trafficking, to ESA. Based on the existence of this protocol and the widespread and obvious trafficking at the Subject Extended Stay America, there were multiple instances of suspected sex trafficking that were or should have been reported to ESA.

407. ESA had constructive knowledge of the widespread and ongoing trafficking at the Subject Extended Stay America because this trafficking resulted from ESA's failure to exercise ordinary care operating the hotel.

**C.     It was apparent and obvious that C.M.S. was being trafficked at the San Diego Extended Stay America.**

408. During the period that C.M.S. was trafficked at the San Diego Extended Stay America, there were obvious signs that her traffickers were engaged in sex trafficking:

a. C.M.S.'s trafficker would sometimes force her to book the room herself. The hotel staff observed her and saw that she was emotional, nervous, and scared.

b. The hotel rooms in which she was trafficked were frequently paid for with cash.

c. Hotel staff saw C.M.S. arrive and leave with her traffickers. These traffickers escorted C.M.S. around the hotel and it was apparent they were monitoring her and controlling her movements.

d. The "Do Not Disturb" door hanger was used very frequently.

e. Housekeeping staff was often prevented from entering the room for regular cleaning, towel exchange and other standard room services. C.M.S.'s traffickers would require staff to provide towels, linens and other supplies at the door without allowing them to enter.

f. C.M.S. had many johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

g. There was heavy foot traffic in and out of C.M.S.'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

h. C.M.S.'s continuous trafficking and the associated physical violence, control, threats, and manipulation her traffickers used had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the subject hotels including effects on C.M.S.'s appearance, demeanor, movements throughout the hotels, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that C.M.S. was being continually subjected to coercion, control, and exploitation

i. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

409. Based upon information and belief, multiple employees at the San Diego Extended Stay America, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

410. As such, ESA knew about or was willfully blind to the fact that C.M.S. was being trafficked at the defendant's respective hotel.

411. ESA also knew or should have known about C.M.S.'s trafficking based on the other methods, listed above, that they used to monitor and supervise the San Diego Extended Stay America.

412. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Extended Stay America branded hotels, and at the subject hotels, ESA had a duty to exercise ordinary prudence to detect and respond to signs of sex trafficking at this hotel. Based on the obvious signs of C.M.S.'s sex trafficking, this sex trafficking was detectable to ESA with the exercise of ordinary prudence.

**D.    ESA facilitated the trafficking activity at the San Diego Extended Stay America, including the trafficking of C.M.S.**

413. ESA is responsible for the acts, omissions, and knowledge of all employees of the Subject Extended Stay of America when operating the hotel because these acts and omissions were committed in the scope and course of employment, because ESA ratified these acts and omissions, and because ESA failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to ESA, of human trafficking occurring at the Subject Extended Stay America.

414. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Extended Stay America, ESA continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

415. ESA knew or was willfully blind to the fact that C.M.S. was being trafficked and, despite this, benefited from continued association with her trafficker by providing him a venue in the form of hotel rooms and related services, to facilitate C.M.S.'s sexual exploitation.

416. ESA also facilitated widespread trafficking at the Subject Extended Stay America, including the trafficking of C.M.S., in ways including:

   a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

   b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

   c. adopting and enforcing training methods for hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

   d. adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

   e. providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of hotel staff related to human trafficking;

g. continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking;

h. continuing to provide wi-fi services to traffickers even though it knew or should have known those services were being used for advertising victims for sexual exploitation.

i. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**E. ESA Defendants are jointly responsible for the San Diego Extended Stay America.**

417. ESA Defendants were, at all relevant times, corporate affiliates.

418. ESA Defendants acted together to operate the San Diego Extended Stay America. Each of the ESA Defendants directly participated in operation and control of this hotel, profited from revenue at this hotel, and exercised mutual control over the affiliated entities involved in the operation of each of these hotels.

419. Upon information and belief, all ESA Defendants were subject to common control and ownership and shared officers, finances, resources, and information regarding operation of the San Diego Extended Stay America.

420. Each of the ESA Defendants participated in a joint venture operating the San Diego Extended Stay America involving a common enterprise, profit-sharing, a community of interests, and joint rights of control and management.

**CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA**

421. C.M.S. incorporates all other allegations.

I.  **CAUSE OF ACTION: PERPETRATOR LIABILITY UNDER 18 U.S.C §1595(A) BASED ON VIOLATION OF 18 U.S.C §1591(A) (RAMADA FRANCHISEES, SUPER 8 FRANCHISEES, L     A QUINTA FRANCHISEE, WYNDHAM GARDEN FRANCHISEE, HILTON-HOMEWOOD SUITES FRANCHISEE, COMFORT INN FRANCHISEES, RODEWAY INN FRANCHISEES, ECONO LODGE FRANCHISEE, QUALITY INN FRANCHISEE, AND ESA)**

422. C.M.S. is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

423. Ramada Franchisees, Super 8 Franchisees, La Quinta Franchisee, Wyndham Garden Franchisee, Hilton-Homewood Suites Franchisee, and Comfort Inn Franchisees, Rodeway Inn Franchisees, Econo Lodge Franchisees, Quality Inn Franchisees, and ESA are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

> a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including C.M.S.) knowing or in reckless disregard of the fact that the

victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

    b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at their respective hotel properties.

424. Violations of 18 U.S.C §1595(a) by each of these Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause C.M.S. to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

## II.    CAUSE OF ACTION: BENEFICIARY LIABILITY UNDER §1595 (A) OF THE TVPRA (ALL DEFENDANTS).

425. C.M.S. is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

426. Each Defendant is liable as a beneficiary within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendant knew or should have known was engaged in a violation of the TVPRA.

427. **Venture 1:** Through acts and omissions more fully described throughout this First Amended Complaint, each Defendant received a financial benefit from participating a venture with sex traffickers at its respective hotel, including C.M.S.'s trafficker. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

- Venture 1 resulted when each Defendant developed and maintained a continuous business relationship and implicit understanding with sex traffickers at its respective hotel(s) by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the hotel(s) to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of C.M.S.

- This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including C.M.S., in the rooms of the subject hotels.

- Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

- Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including C.M.S.'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including C.M.S.). Each Defendant received a financial benefit every time a trafficker rented a room.

- Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including C.M.S.'s trafficking).

428. **Venture 2**: Through acts and omissions more fully described throughout this First Amended Complaint, each Defendant received a financial benefit from

participating in Venture 2 with the other Defendants involved in operating its respective hotel(s) as follows:

- Venture 2 is a commercial venture that resulted from the business relationship between the Defendants involved in operation of each respective hotel with a common objective of maximizing revenue at the hotels, including gross room revenue.

- The venture violated the TVPRA through the widespread sex trafficking that occurred at each of the hotels, including the trafficking of C.M.S. This venture also violated the TVPRA through the conduct of the defendants who, as alleged above, violated 18 U.S.C §1591(a) as perpetrators.

- Each Defendant, at the relevant time, knew or should have known Venture 2 was engaged in violations of the TVPRA.

- Each Defendant knowingly benefited from this venture through revenue generated from rental of rooms at its respective hotel(s), which increased every time a room was rented including rooms rented to traffickers.

- Each Defendant participated in Venture 2 through its operational role at its respective hotel(s) as described throughout this First Amended Complaint. Each Defendant also participated in Venture 2 through facilitating widespread trafficking at its respective hotel(s) as described above.

429. Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause C.M.S. to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**III. CAUSE OF ACTION: VICARIOUS LIABILITY FOR TVPRA VIOLATIONS (WYNDHAM HOTEL FRANCHISORS, LA QUINTA FRANCHISORS, WYNDHAM GARDEN FRANCHISORS, HILTON-HOMEWOOD SUITES FRANCHISOR, CHOICE HOTELS, EXTENDED STAY AMERICA DEFENDANTS).**

430. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its agents and subagents.

431. The franchisor defendants are vicariously liable for the TVPRA violations of their respective franchisees and the staff of their respective hotels based on the existence of an actual agency relationship as follows:

- The Ramada Franchisors are vicariously for the TVPRA violations of Ramada Franchisees and the staff of the hotel;
- The Super 8 Franchisors are vicariously liable for the TVPRA violations of the Super 8 Franchisees and the staff of the hotel.
- The La Quinta Franchisors are vicariously liable for the TVPRA violations of the La Quinta Franchisees and the staff of the hotel.
- The Wyndham Garden Franchisors are vicariously liable for the TVPRA vioaltions of the Wyndham Garden Franchisees and the staff of the hotel
- The Hilton-Homewood Suites Franchisor is vicariously liable for the TVPRA violations of the Hilton-Homewood Suites Franchisee and the staff of the hotel.
- Choice Hotels is vicariously liable for the TVPRA violations of the Econo Lodge Franchisee, Quality Inn Franchisees, Comfort Inn Franchisees, and Rodeway Inn Franchisees and the staff of the hotel.

432. As described above, each of these franchisors exercised pervasive control over the day-to-day operations of its respective franchisee(s) and specifically retained and exercised control over the specific aspects of operations that caused harm to C.M.S.

433. Under the TVPRA and the federal common law, an entity that participates in a joint venture is vicariously liable for the TVPRA violations of all other members of that joint venture. As further described above, the following defendants are

vicariously liable for one another's acts and omissions which were committed within the scope of their participation in a joint venture:

- The Ramada Franchisors are jointly responsible for one another's TVPRA violations committed while they jointly operated and controlled the Anaheim Ramada Inn.

- The Super 8 Franchisors are jointly responsible for one another's TVPRA violations committed while they jointly operated and controlled the Escondido Super 8.

- The La Quinta Franchisors are jointly responsible for one another's TVPRA violations committed while they jointly operated and controlled the Temecula La Quinta.

- The Wyndham Garden Franchisors are jointly responsible for one another's TVPRA violations committed while they jointly operated and controlled the San Diego Wyndham Garden.

- ESA Defendants are jointly responsible for one another's TVPRA violations committed while they jointly operated and controlled the San Diego Extended Stay America.

## DISCOVERY RULE

434. To the extent Defendants assert an affirmative defense of limitations, C.M.S. invokes the discovery rule. At the time she was harmed, and through at least 2015, C.M.S. was under coercion and control of traffickers who abused and manipulated her. Thus, C.M.S. did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, C.M.S. —through no fault of her own—lacked the information to bring a claim because she did not know both her injury

and the cause of her injury. This lack of information was a direct result of C.M.S. being kept under the control of her traffickers, which Defendants facilitated.

435. At the time C.M.S. was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

436. To the extent Defendants assert an affirmative defense of limitations, C.M.S. invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, C.M.S. faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before C.M.S. filed this lawsuit.

437. As a result of her continuous trafficking at the subject properties through at least 2015, C.M.S. was beaten, drugged, sexually assaulted, and mentally abused. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially benefited from her trafficking but may not have been seen to be directly involved.

438. C.M.S. was under the continuous control of her traffickers through at least 2015. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights.

439. C.M.S.'s traffickers physically, psychologically, and practically prevented her from discovering and pursuing her cause of action during the entire period when she was continuously trafficked.

440. To the extent Defendants assert an affirmative defense of limitations, C.M.S. also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

441. C.M.S. was subject to continuous trafficking at the subject properties through at least 2015, which is not more than 10 years before C.M.S. filed this lawsuit.

442. This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the subject properties and Defendants' ongoing venture with one another and with criminal traffickers.

443. Claims against Apple Eight Hospitality Management, Inc., relate back to the filing of the Original Complaint because Apple Eight Hospitality Management, Inc., is a corporate affiliate of entities named as defendants in the Original Complaint, and it knew or should have known that it would have been named as a defendant in the Original Complaint but for a mistake by Plaintiff.

## DAMAGES

444. Defendants' acts and omissions, individually and collectively, caused C.M.S. to sustain legal damages.

445. Defendants are joint and severally liable for all past and future damages sustained by C.M.S.

446. C.M.S. is entitled to be compensated for personal injuries and economic damages, including:

a. Actual damages (until trial and in the future)

b. Incidental and consequential damages (until trial and in the future);

c. Mental anguish and emotional distress damages (until trial and in the future);

d. Lost earnings and lost earning capacity (until trial and in the future);

e. Necessary medical expenses (until trial and in the future);

f. Life care expenses (until trial and in the future);

g. Physical pain and suffering (until trial and in the future);

h. Physical impairment (until trial and in the future);

i. Exemplary/Punitive damages;

j. Attorneys' fees; and

k. Costs of this action.

l. Pre-judgment and all other interest recoverable.

## **JURY TRIAL**

447. C.M.S. demands a jury trial on all issues.

## <u>RELIEF SOUGHT</u>

448.   WHEREFORE, C.M.S. prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for C.M.S. against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which C.M.S. may, in law or in equity, show herself to be justly entitled.

DATED: June 21, 2024                    Respectfully submitted,

By: */s/Moze Cowper*
C. Moze Cowper (Bar No. 326614)
mcowper@cowperlaw.com
**COWPER LAW PC**
12301 Wilshire Boulevard, Suite 303
Los Angeles, California 90025
Tel.: (877) 529-3707

Patrick Barrett (*to be admitted pro hac vice*)
pbarrett@pulf.com
**PROVOST UMPHREY LAW FIRM**
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
Tel.: (615)297-1932

Bryan O. Blevins (*to be admitted pro hac vice*)
bblevins@pulf.com
**PROVOST UMPHREY LAW FIRM**
350 Pine Street, Suite 1100
Beaumont, Texas 77701
Tel.: (409) 838-8858

Edward Fisher (*to be admitted pro hac vice*)

efisher@pulf.com
**PROVOST UMPHREY LAW FIRM**
350 Pine Street, Suite 1100
Beaumont, Texas 77701
Tel.: (409) 838-8813

Annie McAdams (*to be admitted pro hac vice*)
annie@mcadamspc.com
**ANNIE MCADAMS PC**
2200 Post Oak, Suite 1000
11th Floor, PNC Tower
Houston, Texas 77056

*Attorneys for Plaintiff*